442 F.2d 1247
 Troy S. MORRIS and the Travelers Indemnity Co., Appellants,
v.
UHL & LOPEZ ENGINEERS, INC., Appellee.
UNITED STATES of America, Appellant,
v.
UHL & LOPEZ ENGINEERS, INC., and Gottlieb Contracting, Inc., Appellees.
 Nos. 64-69.
 Nos. 77-70.
 United States Court of Appeals, Tenth Circuit.
 May 4, 1971.
 Rehearing Denied July 6, 1971.
 
 Sterling F. Black, Los Alamos, N. M. (Paul A. Phillips, Albuquerque, N. M., on the brief), for appellant Morris.
 James C. Hair, Jr., Washington, D. C. (William T. Ruckelshaus, Asst. Atty. Gen., Victor R. Ortega, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, on the brief), for appellant United States.
 Frank H. Allen, Jr. and John R. Cooney (Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, N. M., on the brief), for appellee Uhl & Lopez Engineers, Inc.
 Before LEWIS, Chief Judge, JOHNSEN, Senior Circuit Judge* and HOLLOWAY, Circuit Judge.
 JOHNSEN, Senior Circuit Judge.
 
 
 1
 These two appeals — one by Troy S. Morris and the other by the United States — are from three separate judgments as incidents in a suit instituted by Morris against the United States and against Uhl & Lopez Engineers, Inc. We reverse in the appeal of Morris, affirm one of the judgments in the appeal of the United States, and reverse as to the other.
 
 
 2
 Morris' amended complaint sought damages against the two defendants, on a separate cause of action as to each, for personal injuries sustained by him when an electric utility pole on which he was engaged in working broke off at its base from internal decay.
 
 
 3
 Morris was an employee of Gottlieb Contracting, Inc. Travelers Indemnity Co., the compensation carrier of Gottlieb, made payment to Morris of the benefits provided by the New Mexico Workmen's Compensation law, and it was accordingly joined subrogationally as plaintiff with him in his complaint and also as appellant with him in his appeal. This aspect, however, need not and will not be alluded to further.
 
 
 4
 Morris' claim against the United States was one under the Federal Tort Claims Act, predicated on allegation that the United States, as owner of the pole and the land on which it stood, constituting a part of the Los Alamos, New Mexico, facilities of the Atomic Energy Commission, was liable for the negligence of the Commission in having permitted him to climb and work on the pole, when it knew or should have known that the pole was latently so weak and defective as to be unsafe, and in having failed in these circumstances to give notice or warning to him. The electric-line tasks in which Morris was engaged were being done under a contract between his employer, Gottlieb, and the Atomic Energy Commission, and it was on this basis that he claimed to have the status of a business invitee of the Commission in his climbing and working on the pole.
 
 
 5
 Morris' cause of action against Uhl & Lopez was predicated on a claim of failure also on its part to have given him notice or warning of the unsafe condition of the pole. Its duty in this regard was alleged to exist from its having had a previous contract with the Commission to make a survey and report on the condition of a portion of the Commission's electric facilities, which included the pole here involved; from its having found on the examination and testing engaged in by it that the pole had undergone such internal decay as to prompt it to make recommendation to the Commission that the pole should be replaced; from its further having entered into another contract with the Commission for inspection and supervision by it of the work to be done under the Gottlieb contract; and from this contract having contained a provision that Uhl & Lopez "shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public to minimize danger from all hazards to life or property * * *".
 
 
 6
 As indicated, replacement of the pole was not to be done under the Gottlieb contract. That contract, however, called for some line work to be done upon the pole, and it was this work in which Morris was engaged at the time the pole broke. Replacement of the pole was made a part of some rehabilitation work which was to be done because of Uhl & Lopez's previous report and recommendations, under a contract between the Commission and another contractor.
 
 
 7
 Morris' cause of action against Uhl & Lopez was made the subject of a separate trial without a jury, on which the court made findings that Uhl & Lopez had been guilty of negligence in failing to notify Morris of the unsafe condition of the pole; that Morris, however, had also been guilty of negligence contributing to the accident; that such contributory negligence barred him under New Mexico law from any right to recovery; and that dismissal therefore was required to be made of his cause of action against Uhl & Lopez. It is this judgment of dismissal which is the subject of Morris' appeal.
 
 
 8
 Prior to the Uhl & Lopez trial, the United States entered into an agreement of compromise and settlement with Morris of his cause of action against it. It thereafter made payment to him of the sum of $20,000, without admitting thereby any liability or fault, in release of all claims which could exist against it on account of the accident and also against any other persons except Uhl & Lopez; had approval made of the settlement by the court; and had dismissal entered by Morris, with prejudice, of his cause of action against it. It then filed a cross-claim for indemnity from Uhl & Lopez of the $20,000 which it had paid. Additionally, it impleaded Gottlieb Contracting, Inc., as a third party defendant, making claim of a right to indemnity also from Gottlieb.
 
 
 9
 The court made summary dismissal of both of the claims for indemnity. It is these dismissals which are the subject of the appeal taken by the United States.
 
 I.
 APPEAL BY MORRIS
 
 10
 (A)
 
 
 11
 Before dealing with Morris' appeal on its merits, it is necessary to dispose of a motion by Uhl & Lopez for dismissal of his appeal on the ground that the notice of appeal filed was premature and therefore not effective.
 
 
 12
 Morris had filed notice of appeal after entry of the judgment against him on the Uhl & Lopez trial and after denial had been made by the court of his subsequent motions for a reopening of the case or for a new trial thereof. At that time, however, dismissal of the cross-claim of the United States against Uhl & Lopez and of its claim on third-party complaint against Gottlieb had not yet occurred. Because no order had been entered under Rule 54(b), F.R.Civ.P., making the judgment against Morris separably final, Uhl & Lopez moved in this Court to have the attempted appeal dismissed for lack of jurisdiction. This Court entered an order authorizing the trial court to entertain a motion to have the Morris judgment given separable finality, but it expressly retained "jurisdiction of the cause for all other purposes". Before any motion was so made, the court entered the judgments of dismissal referred to, disposing of the two indemnity claims, thereby terminating all aspects of the litigation and leaving all judgments in the case subject to the right of appeal. Morris did not file another notice of appeal, but proceeded on the basis of the notice previously filed and in reliance upon the order of this Court retaining jurisdiction.
 
 
 13
 In our view, the notice of appeal had capacity in the circumstances to provide jurisdictional basis that would entitle this Court to refuse, as it did, to make dismissal of the appeal out-of-hand and to allow the notice to ripen into full effectiveness as to the rendered judgment, since it seemed apparent that the judgment would remain unchanged in its form and content; that its lack of technical formal finality would become dispelled in natural course and within a not undue period of time; and that no prejudice could result to any one from so dealing with the notice.
 
 
 14
 If any elements or events might thereafter intervene which could cause the notice to become defeasant in its jurisdictional hold, the Court could then engage in appropriate dismissal in relation to it. It may incidentally be observed that such a treatment of the notice does not involve a violation of the provision of Rule 26, F.R.App.P., that "the court may not enlarge the time for filing a notice of appeal". It should be added that the soundness of this viewpoint finds support in United States v. Arizona, 346 U.S. 907, 74 S.Ct. 239, 98 L.Ed. 405, reversing the judgment in 206 F.2d 159 (9 Cir. 1953); Eason v. Dickson, 390 F.2d 585 and other Ninth Circuit decisions; Markham v. Holt, 369 F.2d 940 (5 Cir. 1966); and Keohane v. Swarco, Inc., 320 F.2d 429 (6 Cir. 1963).
 
 
 15
 We accordingly hold that this Court properly could refuse at the time to dismiss the appeal on the notice that was filed; that it had the right to continue the notice in effect, to retain jurisdiction of the appeal thereunder in the natural ripening of the judgment into formal finality, and to deal with the merits of the appeal thereon unless intervening elements or events should give defeasance to the effect or application of the notice; and that the present renewed motion of Uhl & Lopez for dismissal therefore should be and hereby is overruled.
 
 
 16
 (B)
 
 
 17
 Proceeding to the merits of Morris' appeal, the only question which it is necessary to discuss, in view of the result we reach, is whether the court's finding that Morris had been guilty of contributory negligence was legally erroneous in having been made upon the basis that Morris had failed to comply with the safety standards and recognized practices of the industry, when the evidence could not be said to show expressly that these recognizedly had application to situations of successive or secondary pole mountings, such as here involved on the part of Morris, but they were merely testified to as having application to a pole mounting by a lineman in general and hence in our opinion only clearly established that they were mandated requirements in initial or primary climbings.
 
 
 18
 Some of the uncontroverted aspects of the situation will first be stated. Morris was an experienced electrical lineman of journeyman status. He and another journeyman lineman named Williams had been working together on incidents of the line-work which was to be done under the Gottlieb contract. An employee of Uhl & Lopez named White had the responsibility of inspection and supervision of the Gottlieb work as it proceeded, but White was not present at the time of the accident. Just prior to the accident, Morris had been working by himself upon another pole and when this task was completed he came over to the pole on which Williams was working and where Szymanski, the foreman of Gottlieb, was standing. Szymanski told Morris what the work consisted of that was to be done upon the pole and directed him to go up and assist Williams. The two workmen were to sever and lower to the ground four wires extending out from one side of the pole, but were to leave remaining in position the lines coming in on its other side.
 
 
 19
 The evidence further is without dispute that electric utility poles are regarded in the industry and in the work field as presenting in general a possibility of hazard from internal decay to any mounting of them. There also is no real dispute that in this possibility of hazard there had come to exist standards and practices, referred to above, as to taking precautions of a certain type or character by a lineman before mounting a pole; that these consisted in the first instance of a number of detection tests as to the condition of the pole which a lineman would use at least one or more of, depending upon the situation; that the simplest and most commonly used one of these tests was to strike the pole at or near its base with a hammer or a steel bar to detect if it had a hollow sound; and that if a lineman thus deemed a pole to be unsafe to climb, he had the right to refuse, with impunity, to do so until some appropriate safeguards were authorized or made.
 
 
 20
 There also was testimony that, under the standards and practices, if the work which a lineman was to do would substantially alter the stress or strain upon a pole — such as removal of the four wires here from one side of it — he had the duty to engage in or request such counterbalancing or compensatory guying as he deemed necessary to assure that the pole would be safe to work on.
 
 
 21
 Morris admitted that the only thing he had done as to detecting the condition of the pole was to look or glance at its outer appearance on the side toward him before he mounted it. He testified that the pole looked "all right" to him in its outer appearance; that beyond this he had relied on the fact that Williams had already mounted the pole and was working at its top when he got there; that he had worked with Williams for some time and regarded him as a competent and prudent lineman; and that on these elements, together with Szymanski's presence and direction to him, he had not deemed any detection tests or other protective appraisals and measures to be required of him or to be necessary, such as would be incumbent upon a lineman who was making an original climbing.
 
 
 22
 The Court's finding on contributory negligence was as follows:
 
 
 23
 "7. Plaintiff knew, or in the exercise of reasonable care, should have known that pole 100 was unsafe to perform the work requested of him by his employer. That said pole was defective at its base, but that it was held up by a guy wire and by a heavy electric line. That when the line dropped, the pole fell. That plaintiff knew that the line was to be dropped and, nevertheless, climbed the pole without any investigation and without providing some means to hold the pole in place. That such conduct was negligent and contributed to the accident."
 
 
 24
 We would, as what has been previously said intimates, have no difficulty with this finding as a basis for the contributory negligence held by the court to exist, if the situation had been one of Morris being the only or the initial lineman to mount the pole. In holding, however, to the effect that Morris had a duty to engage in investigation and appraisal and to have provided "some means to hold the pole in place" it seems clear that the court regarded the standards and practices referred to as having application establishedly and recognizedly in the field to Morris' situation of successive mounting, the same as if it had been an initial one.
 
 
 25
 If such an application did establishedly and recognizedly exist as to a second, and hence necessarily also as to a third, fourth, or fifth successive mounting, it would in our opinion represent a fact special or peculiar to the industry and not a matter of common knowledge or ordinary concept, and thus would have to be expressly proved in order to enable or entitle it to be held to be a fact. It would not within layman's general view be believed, we think, except on special knowledge from express proof, that a lineman who was mounting a pole successively to another of equal skill was industrially required to engage in the same ritual of detection testing and hazard appraising as was imposed upon an original mounter, and that there existed in the industry no right whatsoever on the part of a crew member or co-worker to rely on or place any trust in what the original mounter had or could be deemed to have done — even where the situation was one as here of the original lineman being at the time working on top of the pole. The court would not, if the case had been tried to a jury, have been able to instruct that the evidence entitled it to be found as an established fact that the general standards and practices testified to recognizedly had application in the industry to Morris' successive mounting of the pole. No more could the court on the evidence regard this as a proven fact on which to predicate or make its own finding of contributory negligence turn.
 
 
 26
 The closest that the evidence approached to this aspect was in the testimony of a witness named Duncan. Duncan had been a journeyman lineman for a number of years and was at the time the safety director for a utility company. The court apparently regarded him as possessing such qualification as to be an expert in the field and so to be entitled to give opinion testimony in relation to the accident. It accordingly permitted a hypothetical question to be put as to what a prudent lineman would have done in the circumstances of the situation. The question, however, did not include as a specific element the matter of a successive mounting being involved as against an initial one. It called upon the witness to state, without any reference being made to the fact of Williams' prior mounting and presence on the pole, what precautions he would have taken within the standards and practices of the industry "prior to climbing that pole and performing that removal work".
 
 
 27
 When Morris' counsel interposed objection to the question for failure to include the Williams' aspect in its hypothesized facts, counsel for Uhl & Lopez chose not to add this to the question. The court stated that the element could be gone into on cross-examination and permitted the question to be answered as asked. The witness was thus free to answer abstractly or generally and not specifically in relation to Morris' situation. Morris' counsel did thereafter attempt to go into the matter on cross-examination. Thus he put the question to the witness in relation to one of the detection tests which the latter had enumerated whether each individual lineman who climbed a pole as part of a crew would engage in making such a test, to which the witness gave the answer "I would". When pressed, however, he admitted that originally when he was a lineman he might not have done so but "I had one [pole] fall with me and I am not taking that chance anymore".
 
 
 28
 The answer of the witness as to what he personally would have done because of his particular experience would not be sufficient to establish that this constituted what other linemen were required to do or would have done in successive mounting situations. Nor do we believe that the answer of the witness was in fact intended to create such an impression or to carry such an implication when read in relation to the admission made in another portion of his testimony. When he was cross-examined about another detection test which he had related and was asked whether each lineman in a crew was supposed to engage in it or if, for instance, "the superintendent did it they would rely on his test" he candidly replied "No, there wouldn't be any need for but one man to test it".
 
 
 29
 The testimony of this witness and of the other witnesses sufficiently established or confirmed that the standards and practices as discussed above constituted a general recognized duty in the industry or lineman's field. But insofar as it is attempted to be contended that the application of the standards and practices went beyond constituting a required duty in sole or initial mountings and extended similarly to all linemen in any successive or crew-member mountings, we think, as stated above, that this would in laymen's concept be regarded as so unusual that it would have to be held to be special or peculiar to the industry, and that it thus would be required to be expressly established by the evidence that such was indeed the fact. We are not able to read the evidence as sufficient to so establish.
 
 
 30
 We accordingly must hold on the record before us that in predicating its finding of contributory negligence upon the basis that the standards and practices had such a recognized application and that Morris was guilty of negligence in not having done the acts or made the appraisals which they required, the court erred. The judgment will accordingly be reversed and the cause remanded for further proceedings solely in relation to the issue of contributory negligence.
 
 
 31
 It may be that evidence is available to establish specifically and preponderantly that the general standards and practices as to detection tests and auxiliary evaluations recognizedly have application to the situation of successive mounting here involved. If this is not so established, however, the court's consideration of the question of contributory negligence necessarily must have confinement to a determination on the traditionally normal basis of whether Morris had exercised such general care or prudence as could ordinarily and reasonably be expected of a lineman in the circumstances of the situation.
 
 II.
 APPEAL OF THE UNITED STATES
 
 32
 As previously indicated, the appeal of the United States is from both the summary dismissal of its cross-claim for indemnity against Uhl & Lopez and from a similar dismissal of its claim also for indemnity on third-party complaint against Gottlieb Contracting, Inc. (Morris' employer). The two claims will be discussed separately.
 
 (A)
 
 33
 The cross-claim against Uhl & Lopez was predicated on the alternative bases of (1) a right to indemnity based on tort and (2) a right to indemnity based on contract. The right based on tort is conceded to be governed by New Mexico law. New Mexico recognizes a common law right of indemnity in favor of a tortfeasor who has been guilty of only passive or secondary negligence against another who has been guilty of active or primary negligence. United States v. Reilly, 385 F.2d 225, 229 (10 Cir. 1967). Such right of indemnity is, of course, to be distinguished from the right to contribution under the State's Uniform Contribution Among Tortfeasors Act. N.M.S.A.1953 §§ 24-1-11 to 18. The contribution statute expressly provides that it does not impair any right of indemnity under existing law. § 24-1-16.
 
 
 34
 In its common law right of indemnity in tort, New Mexico appears to be concerned only with the question of passive negligence versus active negligence in their historical or definitional distinction. Its adoption of the Uniform Contribution Act was made to abrogate its previous common law lack of right to any contribution between tortfeasors and "to provide for a proportionate allocation of the burden among tortfeasors who are liable". Its common law right of indemnity, however, has remained a matter of the complete reimbursement of one tortfeasor by another on the basis of the difference in legal kind or class of negligence by which the accident was caused. It does not take account of any personal duties or other equitable considerations which might be involved between the tortfeasors themselves.
 
 
 35
 In this technical test or limitation upon the scope of its tort indemnity right, New Mexico does not stand alone. As Dean Prosser has observed in the section on Indemnity in his text The Law of Torts (3rd Ed.) § 48 at p. 280: "There is * * * considerable authority that one whose negligence has consisted of mere passive neglect may have contribution [referring to indemnity] from an active wrongdoer". Other states have used different bases and scopes for their common-law indemnity right. Dean Prosser summarized the situation as follows, at p. 281: "Out of all this, it is extremely difficult to state any general rule or principle as to when indemnity will be allowed and when it will not".
 
 
 36
 But these variances — including the fact that a substantial number of states have adopted as a standard or part of their standard whether "the indemnitor has owed a duty of his own to the indemnitee" — are of no significance here if New Mexico law is, as we appraise it to be, that the nature and scope of the right are solely a matter of the legal kind or class of negligence which has been involved in relation to the accident. Also, while it is possible for differences to exist in the volume or extent of negligence of the same kind between members of a particular class, this is of no relevance, since this would be a question only in relation to contribution and not to indemnity. Members of a class occupy the same legal position with respect to each other, or in other words are in pari delicto between themselves. Thus, in Rio Grande Gas Co. v. Stahmann Farms, Inc., 80 N.M. 432, 437, 457 P.2d 364, 369 (1968), where one tortfeasor was seeking indemnity from another in a gas-leak situation, the New Mexico Supreme Court said that "each failed to discover the dangerous condition, i.e., the gas leak, or correct the condition" or to have given notice thereof and "the two parties are accordingly in pari delicto * * *". "One tortfeasor may not recover [indemnity] from another when they are in pari delicto". Ibid.
 
 
 37
 We have dwelt on this aspect because we think it controlling of the attempt of the United States to recover indemnity from Uhl & Lopez here. While the United States has undertaken to argue that the negligence of Uhl & Lopez was active and its own was merely passive, it seems clear to us that the negligence of both parties, as in Rio Grande Gas, supra, consisted of the same kind or class. Each had failed to give notice or warning to Morris of the dangerous condition of the pole, when as Morris alleged, and as would seem apparent from the report which the Atomic Energy Commission had had made to it and on the basis of which it had contracted to have the pole replaced by another contractor, and from Uhl & Lopez's examination and report to the Commission, and its contract to supervise the Gottlieb work, each had or was chargeable with knowledge of the condition of the pole and had a duty to give notice or warning in relation to Morris' working thereon.
 
 
 38
 It might perhaps even be arguable that in the dangerous condition of its property, in its having contracted to have the pole replaced as unsafe, and in its then having some line work done upon the pole, the failure of the United States to give notice or warning to Morris would amount to more than passive negligence. But however that might be, the failure of the Government to have given notice or warning to Morris was in any event of no lower kind or class of negligence in tort duty to Morris than was that of Uhl & Lopez and there thus could exist no right of tort indemnity between them.
 
 
 39
 (B)
 
 
 40
 The claim against Uhl & Lopez for contractual indemnity is predicated on two bases: (1) application of the doctrine of Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) on implied warranty by Uhl & Lopez to render "workmanlike service" in the performance of its supervisory contract; and (2) obligation to make indemnification under the following provision in its contract:
 
 
 41
 "The contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property * * *".
 
 
 42
 Ryan was a maritime case in which a stevedoring contractor was held liable in indemnity for the shipowner's liability to a longshoreman for injuries occasioned by the negligent manner in which the stevedoring work had been done upon some heavy rolls of pulp paper as ship cargo. The agreement between the shipowner and the stevedoring contractor contained no express provision for indemnity, but the Supreme Court held (350 U.S. at 133-134, 76 S.Ct. at 237):
 
 
 43
 "That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product."
 
 
 44
 This inherent warranty of a stevedoring contractor to perform workmanlike service in its cargo handling was held applicable in Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 79 S.Ct. 438, 2 L.Ed.2d 491 (1958) to an improper use of equipment by the contractor in its cargo handling causing injury to a longshoreman, and in Crumady v. The Joachim Hendrik Fisser Co., 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959) to other acts of the contractor which produced or brought into play unseaworthiness of the vessel.
 
 
 45
 Decisions in some of the Circuits have applied the indemnity principle of these shipowner (or charterer or libeled-vessel) cases to other maritime contracts, and in General Electric Co. v. Moretz, 270 F.2d 780 (4 Cir. 1959), the principle was by analogy given application to a shipper-motor carrier freight-handling relationship. Blockston v. United States, however, 278 F.Supp. 576 at 591, took the view that "the decisions in the maritime cases were clearly policy decisions" having application only to that special field and its liberal liability concepts.
 
 
 46
 In each of the three Supreme Court cases, the factual situation existed that the acts done by the contractor in performance of its cargo-handling services had created unseaworthiness of the vessel, for which condition maritime law recognizes an absolute liability against the shipowner. But Ryan, in affirming the decision of the Second Circuit [reported opinion entitled Palazzolo v. Pan-Atlantic S. S. Corp., 211 F.2d 277 (2 Cir. 1954)] noted that the Court of Appeals had held the liability of the shipowner to the injured longshoreman to be supportable on either or both unseaworthiness of the vessel and negligence of the owner in failing to have provided a safe place to work, and it engaged in no distinction between these aspects in respect to the principle which it declared.
 
 
 47
 While unseaworthiness is a condition or basis of liability unique to the maritime field, the general duty of an owner not to have his property in an unreasonable condition as a proper place to work is not. It may therefore be that as to this aspect the Ryan principle is to be deemed applicable to other fields of federal-law contractual relationship — although we would normally think that the expression in the Ryan opinion, supra, that "Competency and safety of stowage are inescapable elements of the [stevedoring] service undertaken" would have a somewhat stronger force and significance in maritime law than it would in other service fields generally.
 
 
 48
 But be that as it may, it at least is to be noted that as to the liability of an owner on nondelegable responsibility for safe condition of his property, the situation as to which an indemnity right was recognized by Ryan and the two other cases cited was where the unsafe condition for which the owner was subjected to liability had been created or produced by the acts of the contractor. The stevedoring work, in its performance by the contractor, said the Ryan opinion, involved a "warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product".
 
 
 49
 Here, however, the unsafe condition of the property on which Morris was to work was not created or produced by Uhl & Lopez. It was not any performance-acts on its part which gave rise to the dangerous condition of the premises. That condition was already in existence. Beyond this, Uhl & Lopez's contract was not one for the performance of any work by it in relation to the pole, but only for supervision of Gottlieb's line-removal work. This supervisory obligation to see that Gottlieb's work conformed to the contract prescriptions and specifications, and in that connection to take all reasonable precautions to protect the health and safety of employees and members of the public, cannot, in our opinion, be equated or analogized into a situation of having created a dangerous premise condition, such as in the Ryan case, as a basis for indemnity right on implied warranty of workmanlike services. In these circumstances, and on this character of services, any right to indemnity against Uhl & Lopez would not, we think, be able to be claimed either in general law or on the affirmative-acts basis underlying the Ryan holding, to constitute a breach of implied warranty in unworkmanlikeness of the things done. Any right to indemnity in the situation could accordingly not have existence from implied warranty but only from language appearing in the contract.
 
 
 50
 We hold that the United States does not have a right of indemnity against Uhl & Lopez on the basis of the Ryan decision as a matter of implied warranty.
 
 
 51
 We turn then to the alternative contention that the language of the Uhl & Lopez contract does in fact provide for a right to indemnity. The contract provision relied on has been quoted above, but for convenience will be repeated: "The Contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property * * *".
 
 
 52
 There is not in this provision, nor in the contract elsewhere, any language which expressly imposes an indemnity obligation upon the contractor, such as the reported decisions indicate the Government has generally incorporated into its contracts, where it wanted to effect that object. The Government seems for over thirty years in such situations to have used a clause in its contracts specifically providing that the contractor "shall be responsible for all damages to persons or property that occur as a result of his fault or negligence * * *" [or one of substantially similar language], which provision was given construction in United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970).
 
 
 53
 The Gottlieb contract [which is considered below], as to whose performance Uhl & Lopez were to engage in supervision, was made to include such an express provision. Further language was even added thereto providing that the contractor "shall indemnify and hold harmless the Government and its officers and employees from and against all claims or suits based upon any such injury or damage".
 
 
 54
 The intention manifested as to the Gottlieb contract, and on the Government's general use in other contracts of a clause for responsibility or indemnity as to damages caused by a contractor's fault or negligence, stands out in sharp contrast to the lack of any such provision in the Uhl & Lopez contract and seems to us significant in the situation, especially in view of the difference in character of the two contracts. It could perhaps be that the United States regarded the supervisory obligation of Uhl & Lopez as not representing such character of work as would have any substantial likelihood of becoming a causative factor in an accident. Or since Uhl & Lopez's supervisory responsibility had relation to Gottlieb's performance, it might be that the Government deemed any possible involvement which Uhl & Lopez could have as to an accident would naturally be tied into Gottlieb's performance of its work and that thus the obligation of indemnity imposed upon Gottlieb would be sufficiently protective to it.
 
 
 55
 But we need not rationalize or speculate on why a provision of responsibility or indemnity was not included in the Uhl & Lopez contract. Whatever the reason may have been, the important thing here is the fact that it was not. And in its necessary recognition of this fact, the United States has been driven to an attempt to squeeze an indemnity intention and obligation out of the following clause in the contract, as noted above:
 
 
 56
 "The Contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property."
 
 
 57
 Again, however, this general safety clause says or suggests nothing as to an intended damage-indemnity obligation in favor of the United States. The clause seems to be a standard provision inserted generally by the United States in a separate division of its contract forms, bearing a "safety" heading or title, and making no reference or manifesting any relationship to the separate division of the contract used to establish a right to reimbursement where the Government apparently deems the contracting situation to be one where it is equitably and publicly appropriate that it should be so reimbursed. The safety clause emphasizes concern for both employee and public safety and requires that all reasonable precautions be taken by the contractor to minimize danger from all hazards to life and property. Whatever may be its significance in duty to employees and members of the public, its language is not such as to create an indemnity obligation or to manifest to a contractor any intention to so do.
 
 
 58
 A contractor familiar with the standard provisions used by the Government in its contracts (the record indicates that Uhl & Lopez had had several) would naturally look to the "liability" or "indemnity" division of his contract and not to the "safety" division to see what obligation for indemnity the Government was insisting on against him. The "safety" clause could provide no more basis for an indemnity obligation in the Uhl & Lopez contract than it would in the Gottlieb contract — and the Government has not presumed to argue it as a basis or any part of the basis for its asserted indemnity right against Gottlieb.
 
 
 59
 To contend that the "safety" clause is entitled to be construed as an indemnity provision in the Uhl & Lopez contract but is not required to be so treated in other contracts is to argue that it is capable of being accorded different constructions having a varying significance, or in realistic terms that it is ambiguous. But on that premise the provision would be within the expression of the majority opinion in Seckinger, supra, 397 U.S. at 210, 90 S.Ct. at 884:
 
 
 60
 "In fashioning a federal rule, we are, of course, guided by the general principles that have evolved concerning the interpretation of contractual provisions * * *. Among these principles is the general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States."
 
 
 61
 Also applicable is the general statement in the minority opinion of Seckinger, 397 U.S. at 221-222, 90 S.Ct. at 890-891:
 
 
 62
 "Even in the domain of private contract law, the author of a standard-form agreement is required to state its terms with clarity and candor. Surely no less is required of the United States of America when it does business with its citizens".
 
 
 63
 There is no contention here that there were circumstances or dealings which would show that the parties mutually intended the clause to have the indemnity-obligation meaning for which the Government contends in the particular situation, different from the purpose and significance which it would normally be given in Government contracts generally in relation to their other standard provisions.
 
 
 64
 We hold that the Uhl & Lopez contract does not provide for an indemnity obligation to the United States and that the dismissal of the cross-claim of the United States is upon this basis entitled to be affirmed. This disposition makes unnecessary any consideration of the other contentions which have been made by the parties in relation to the cross-claim.
 
 
 65
 (C)
 
 
 66
 As to the dismissal of the indemnity claim against Gottlieb Contracting, Inc., we have indicated above that the Gottlieb contract contained a provision imposing a responsibility upon Gottlieb to the United States "for all injury or damage to persons or property * * * that occurs as a result of the fault or negligence of the Contractor * * *", and that it even had a clause of express indemnity terms that Gottlieb "shall indemnify and hold harmless the Government * * * from and against all claims or suits based upon any such injuries or damages".
 
 
 67
 No consideration appears to have been given to these contract provisions in the dismissal which the court made of the Government's claim against Gottlieb. The provisions made unavailing to Gottlieb the ground existing as to Uhl & Lopez, that the language of the latter's contract contained no express indemnity obligation or anything from which such a mutual intention of indemnification could reasonably be said to be impliable.
 
 
 68
 If there are grounds existing as to Gottlieb which would make inapplicable the indemnity provisions of the contract as to the situation involved, or which would entitle Gottlieb to exoneration in relation to them, these are matters for defense and proof in which the court did not engage. The court seems to have regarded Gottlieb as occupying the same position legally as Uhl & Lopez, as suggested by its statement in making the dismissal that "In other words, the cross-claim does not state a claim for relief against anyone".
 
 
 69
 We note, incidentally, that Gottlieb had not filed any pleading in the case up to the time of the trial court's summary dismissal, nor has it filed any brief in this court. In view of the informality which has thus been permitted to exist as to it, the court, upon remand, will be entitled to grant it leave to file an answer and to engage in such proceedings as may be necessary to effect disposition on the basis thereof.
 
 III.
 
 70
 In the Morris appeal, No. 64-69, the judgment is reversed and the cause remanded. In the appeal of the United States, No. 77-70, the dismissal of the claim for indemnity against Uhl & Lopez Engineers, Inc., is affirmed; the dismissal of the claim for indemnity against Gottlieb Contracting, Inc. is reversed and the cause remanded.
 
 
 
 Notes:
 
 
 *
 Of the Eighth Circuit, sitting by designation