997 F.2d 774
 26 Fed.R.Serv.3d 147
 Kenneth L. HINTON, for himself and as father and next friend
of Kamilah Hinton; Kaneasha Hinton; and Gabriel
Hinton, Plaintiffs-Appellants,
v.
CITY OF ELWOOD, KANSAS; Sue Wright, Mayor; William White,
Police Officer; and Larry Myer, Police Officer,
Defendants-Appellees.
 No. 91-3327.
 United States Court of Appeals,
Tenth Circuit.
 June 29, 1993.
 
 Richard E. Jones of Jones and Jones, Topeka, KS, for plaintiffs/appellants.
 J. Steven Pigg of Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendants/appellees.
 Before LOGAN, TACHA, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This case arises out of the arrest of the appellant, Kenneth Hinton,[1] by several Elwood police officers for disorderly conduct. Hinton subsequently filed a claim against the arresting officers, the Mayor of Elwood, and the City of Elwood, pursuant to 42 U.S.C. § 1983, charging that he had been subjected to excessive force in violation of his constitutional rights. The district court dismissed Hinton's claims on summary judgment. We find that the arresting officers' use of force did not rise to the level of a constitutional violation and therefore affirm the district court's dismissal of the appellant's claims.
 
 FACTS
 
 2
 On July 19, 1988, Hinton, a black resident of Elwood, Kansas, discovered that his dog had been tranquilized and impounded by the Elwood animal control officer, Wayne Hall. Hinton approached Hall on three separate occasions to inquire about the incident and about retrieving his dog. Each time Hall told Hinton to wait for his court date and to talk to the judge.
 
 
 3
 The last encounter occurred on July 22, 1988, at Hall's residence, in the company of Hinton's three children and two of his neighbors children. Hinton became angry during this encounter, and told Hall that the daughter of a prior landlord had become ill after she called the animal control officer about his dog. Hall interpreted this comment as a threat and called the police.
 
 
 4
 Elwood police officer Larry Myer responded to Hall's call and located Hinton walking home with his and his neighbor's children. Myer parked his car in the middle of the street and informed Hinton that he wanted to discuss a complaint against him for disturbing the peace. Hinton stated that he had not been disturbing the peace and continued walking.
 
 
 5
 At this point, Hinton alleges that Myer poked him in the chest several times and stated that if he didn't stop he was going to jail. According to Hinton, he told Myer that he did not want to talk in front of the children, but would be willing to talk to Myer after he took the children home. By contrast, Myer denies that he poked Hinton in the chest. He asserts that Hinton shoved him in the chest after he asked Hinton to stop and that Hinton jerked his shirt off as if he wanted to fight.
 
 
 6
 The encounter between Myer and Hinton lasted approximately three minutes before Elwood Mayor Sue Wright arrived, followed shortly thereafter by Elwood Police Chief William White. Hinton alleges that White asked him what was going on and that he told White that he wanted to bring the children home before talking to the police. According to White, he told Hinton to calm down and go home and that if he engaged in one more outburst he would be arrested for disorderly conduct.
 
 
 7
 At the end of this conversation, Hinton shoved Myer out of his way, picked up his youngest daughter, and started to walk away. White then grabbed the appellant from behind and told him he was under arrest. As Hinton began to struggle with White, they both fell against Myer's police car. Wright grabbed Hinton's daughter out of his arms and White and Myer pushed Hinton to the ground where they attempted to handcuff him. Hinton continued to struggle with Myer and White by kicking his feet, flailing his arms, and biting the officers, and in the ensuing scuffle White shoved Hinton's face into the asphalt and twisted his arm behind his back. White eventually used an electrical stun gun to subdue Hinton. While Hinton asserts that White used the gun "numerous amounts of times," White contends that he used the stun gun only three times.
 
 
 8
 Hinton was taken into custody and charged with disorderly conduct, obstructing official duty, and two counts of battery against a police officer.[2] While in custody, Hinton was taken to a local hospital where he was treated for several minor abrasions.
 
 
 9
 At the time of the July 22 incident, Myer had no formal training as a police officer. Although White had received certification from the Kansas Law Enforcement Training Center and had attended a number of police seminars, he had no formal training in the use of a stun gun. Furthermore, the Elwood Police Department had no written rules or regulations governing the conduct of Elwood police officers. White had suggested to the Elwood City Council that it adopt such rules and regulations but this suggestion had been rejected.
 
 
 10
 Hinton filed suit against Myer, White, Wright, and the City of Elwood, asserting claims under 42 U.S.C. § 1983 and various state laws. Hinton's § 1983 claims charged that Myer and White used excessive force to effectuate his arrest, and that Wright and the City of Elwood failed to train Elwood police officers regarding, or to adopt any written polices regulating, the use of force. Hinton's claims also charged that Wright encouraged Myer and White's conduct by her failure to intervene during their encounter with Hinton. The United States District Court for the District of Kansas dismissed these claims on summary judgment. The court concluded that White and Myer were entitled to qualified immunity and that the City of Elwood had not acted with deliberate indifference. The court did not specify why it dismissed Hinton's § 1983 claim against Wright. On appeal, Hinton argues that the district court's dismissal of his § 1983 claims was in error.
 
 JURISDICTION
 
 11
 Before reaching the merits of Hinton's appeal, we must first determine whether Hinton's notice of appeal was timely filed under Federal Rule of Appellate Procedure 4(a). The time periods established by Rule 4(a) for the filing of a notice of appeal are "mandatory and jurisdictional." Senjuro v. Murray, 943 F.2d 36, 37 (10th Cir.1991) (quoting Browder v. Department of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 560-61, 54 L.Ed.2d 521 (1978)).
 
 
 12
 Rule 4(a)(1) requires a notice of appeal in a civil case to be filed "within 30 days after the date of entry of the judgment or order appealed from." Fed.R.App.P. 4(a)(1). Rule 4(a)(5) permits the district court, "upon a showing of excusable neglect or good cause, [to] extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by [Rule 4(a)(1) ]." Fed.R.App.Proc. 4(a)(5). No extension may "exceed 30 days past [the time prescribed by Rule 4(a)(1) ] or 10 days from the date of entry of the order granting the motion, whichever occurs later." Id.
 
 
 13
 Here, the district court entered its summary judgment order on September 9, 1991, and Hinton filed his notice of appeal on October 10, 1991. Accordingly, Hinton's appeal was filed one day beyond the 30-day period specified in Rule 4(a)(1). However, Hinton subsequently filed a motion for an extension of time on November 4, 1991. This motion was within the 30-day period permitted by Rule 4(a)(5) and was granted by the district court on November 6, 1991. The effect of the district court's order was to extend Hinton's time to file a notice of appeal until November 16, 1991. Notwithstanding this extension of time, however, Hinton never filed a second notice of appeal. Thus, our jurisdiction over Hinton's appeal depends on whether his otherwise untimely notice of appeal on October 10 was validated by the district court's approval of his subsequent motion to extend the time to file a notice of appeal.
 
 
 14
 Rule 4(a) does not address whether an order granting a motion to extend the time to appeal may validate a prior notice of appeal. However, Rule 4(a) does address the continuing validity of a premature notice of appeal in two other contexts. Rule 4(a)(2) states "a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry." Fed.R.App.P. 4(a)(2). Rule 4(a)(4) provides that "[a] notice of appeal filed before the disposition of [certain substantive post-trial] motions shall have no effect" and "[a] new notice of appeal must be filed ... [after] entry of the order disposing of the motion."[3] Fed.R.App.P. 4(a)(4). We believe these two provisions stand for the proposition that a premature notice of appeal retains its validity only when the order appealed from is likely to remain unchanged in both its form and its content. When an intervening motion occurs which could alter the order or judgment appealed from, a new notice of appeal must be filed after disposition of the subsequent motion to ensure that the would-be appellant still desires to appeal.
 
 
 15
 This interpretation of Rule 4(a) is supported by our en banc decision in Lewis v. B.F. Goodrich Co., 850 F.2d 641 (10th Cir.1988). In Goodrich, we held that a premature notice of appeal from an interlocutory order disposing of less than all the claims could be cured by a subsequent certification order under Rule 54(b) or a final disposition of the remaining claims. Id. at 645. We reasoned that an interlocutory order disposing of less than all the claims, though lacking in "technical formal finality," would likely "remain unchanged in its form and content." Id. at 644 (quoting Morris v. Uhl & Lopez Engineers, Inc., 442 F.2d 1247, 1250 (10th Cir.1971)). Thus, to require the filing of a new notice of appeal would amount to little more than "empty paper shuffling." Id. (quoting Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin, 760 F.2d 177, 181 (7th Cir.1985)).
 
 
 16
 Based on our conclusion that Rule 4(a) only requires the filing of a new notice of appeal where the order appealed from might change, we believe that Rule 4(a)(5) permits the district court's approval of a timely motion to extend to validate a prior notice of appeal. A motion to extend, unlike a motion for a new trial for example, does not portend any substantive alteration in the form or content of the order being appealed from. Consequently, as in the case of a notice of appeal from an interlocutory order disposing of less than all the claims, to require the filing of a new notice of appeal following a motion to extend would amount to little more than "empty paper shuffling." We do not believe the Federal Rules of Appellate Procedure were designed to impose such a hollow ritual on a would-be appellant. Cf. Goodrich, 850 F.2d at 645 (emphasizing that the notice of appeal requirements should not be interpreted in such a manner as to serve no purpose other than to set "a trap for unwary attorneys").
 
 
 17
 Our decision in Oda v. Transcon Lines Corp., 650 F.2d 231 (10th Cir.1981), does not compel a different conclusion. In Oda, the appellant filed a notice of appeal more than thirty days after final judgment was entered by the district court but within the succeeding thirty day period permitted by Rule 4(a)(5) for requesting an extension of time to appeal. Id. at 232. Along with its notice of appeal, the appellant filed a contemporaneous motion requesting such an extension of time. Id. Although it was unclear whether this motion to extend was ever served on the opposing party as required by Rule 4(a)(5), the district court granted this motion. Id. We dismissed the appeal for lack of jurisdiction, noting that if the district court found that the motion requesting the extension was served before the thirty-day grace period of Rule 4(a)(5), the district court would then have jurisdiction to rule on the motion after affording the appellee an opportunity to respond. Id. at 233. In a footnote, we stated that the appellant would be required to file a new notice of appeal if the district court reaffirmed its order granting the appellant's motion to extend. See id. at 233 n. 4. This statement was dicta because that issue was not before the court. Furthermore, there is no indication that the court specifically considered whether a subsequent motion to extend could validate a prior notice of appeal. In any event, this statement preceded our decision in Goodrich. We believe the rationale of our en banc decision in Goodrich directs the conclusion that the appellant need not file a new notice of appeal following the granting of a timely filed motion to extend under Rule 4(a)(5). See Pasquale v. Finch, 418 F.2d 627, 629 (1st Cir.1969) (stating that counsel may "file the formal [n]otice of [a]ppeal contemporaneously with the motion to extend"); see also Tarabishi v. McAlester Regional Hosp., 951 F.2d 1558, 1563 n. 3 (10th Cir.1991) (concluding that defendant's untimely cross-appeal was validated by the district court's approval of defendant's subsequent motion to extend, but noting that issue raised in cross-appeal would have been considered anyway since a party may raise any ground for upholding a favorable judgment), cert. denied, --- U.S. ----, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); United States v. Hoye, 548 F.2d 1271, 1273 (6th Cir.1977). Accordingly, we find that Hinton's notice of appeal was timely filed and that we may properly consider the merits of his appeal.
 
 DISCUSSION OF CLAIMS
 
 18
 I. Myer and White's Entitlement to Summary Judgment
 
 
 19
 Hinton's first argument on appeal is that the district court erred in dismissing his excessive force claim against Myer and White. The district court dismissed this claim on summary judgment on the ground of qualified immunity.
 
 
 20
 The defense of qualified immunity is designed not only to shield public officials from liability, but also to ensure that erroneous suits do not even go to trial. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 806-08, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982); Pueblo Neighborhoods Health Centers v. Losavio, 847 F.2d 642, 645 (10th Cir.1988). To this end, special rules apply when a public official raises a defense of qualified immunity on summary judgment. In such a case, the plaintiff must initially make a twofold showing. First, the plaintiff must show "that the [public official's] alleged conduct violated the law." Pueblo, 847 F.2d at 646. Second, the plaintiff must show "that the law was clearly established when the alleged violation occurred." Id.
 
 
 21
 If the plaintiff makes the required twofold showing, the public official then bears the usual summary judgment movant's burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Specifically, the public official must show that no material issues of fact remain as to whether his or her actions were "objectively reasonable in light of the law and the information he or she possessed at the time." Coen v. Runner, 854 F.2d 374, 377 (10th Cir.1988) (citation omitted). In determining whether both parties have satisfied their burdens, the court must evaluate the evidence in the light most favorable to the non-moving party. Dixon v. Richer, 922 F.2d 1456, 1462 (10th Cir.1991).
 
 
 22
 The initial twofold burden imposed on the plaintiff requires a court reviewing a qualified immunity claim to analyze the state of the law at two different times. First, the court must analyze the law at the time of trial to determine whether the plaintiff has alleged a violation of existing law as required by the first prong of the plaintiff's summary judgment burden. Then, pursuant to the second prong, the court must analyze the law at the time of the alleged conduct in order to determine whether the plaintiff has established that the defendant's conduct, when perpetrated, violated clearly established law. Generally, these two inquiries will focus on the same legal standard, albeit a standard which may have been refined over the passage of time between the conduct and the trial.
 
 
 23
 The instant case is somewhat of an anomaly, however. Prior to trial but subsequent to the events in question, the Supreme Court held in Graham v. Conner, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), that the Fourth Amendment constituted the exclusive framework for analyzing excessive force claims against police officers. Before this decision, excessive force claims in this circuit were governed by both the Fourth and Fourteenth Amendments, with the latter provision providing the appropriate standard unless the complaint specifically alleged a violation of the Fourth Amendment.[4] See Dixon, 922 F.2d at 1461; Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir.1990). As a result, the Fourth Amendment clearly governs the first prong of Hinton's summary judgment burden. However, whether the "clearly established" analysis under the second prong should be conducted under the Fourth or Fourteenth Amendment depends on whether Hinton specifically alleged a Fourth Amendment violation in his complaint.
 
 
 24
 Ultimately, it is unnecessary for us to determine whether the Fourth or Fourteenth Amendment governs the second prong of Hinton's summary judgment burden. As we conclude below, Hinton has failed to demonstrate that White and Myer's conduct violated the current Fourth Amendment standard governing excessive force claims. Hinton's failure to satisfy the first prong of his summary judgment burden is dispositive of White and Myer's claim to qualified immunity and renders it unnecessary for us to consider whether Hinton satisfied his burden under the second prong by showing that Myer and White violated clearly established law. See Siegert v. Gilley, --- U.S. ----, ----, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (threshold question is whether the defendant's conduct violated existing law); Frohmader v. Wayne, 958 F.2d 1024, 1026 n. 3 (10th Cir.1992) (same).[5]
 
 
 25
 The current Fourth Amendment standard governing excessive force claims was enunciated by the Supreme Court in Graham. The Court stated that the test for whether a police officer's use of force was constitutionally excessive was "whether the officer's actions [were] objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872 (quotations omitted). This inquiry, the Court continued, must be undertaken from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396, 109 S.Ct. at 1872.
 
 
 26
 Although the Court stressed that the Fourth Amendment test of reasonableness "is not capable of precise definition or mechanical application," the Court identified three criteria to be used by the courts in undertaking this inquiry: 1) "the severity of the crime at issue," 2) "whether the suspect poses an immediate threat to the safety of the officers," and 3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. Applying these criteria to the instant case, we conclude that Hinton has failed to demonstrate that Myer and White's conduct was objectively unreasonable under the circumstances, and therefore, in violation of his Fourth Amendment rights.
 
 
 27
 Undeniably, the first two criteria weigh in favor of Hinton's claim that Myer and White's use of force was constitutionally excessive. The crime for which Hinton was initially stopped by the police was the misdemeanor of disturbing the peace. Furthermore, it is difficult to maintain that Hinton constituted any type of immediate threat to the police or the public. There was no showing that he had a weapon or was under the influence of alcohol or drugs. In addition, he was outnumbered by the arresting officers and was in the company of five children during the events in question.
 
 
 28
 However, the third Graham criterion of resisting arrest strongly supports a finding that Myer and White's use of force was objectively reasonable. In Graham, the Court noted that the Fourth Amendment recognizes the right of the police, in making an arrest or a stop, "to use some degree of physical coercion or threat thereof to effect it." Id. Here, even taking the facts in the light most favorable to Hinton, Myer and White's use of force was clearly commensurate with the level of resistance offered by Hinton.
 
 
 29
 Hinton admits that he refused to talk with the police when they requested him to stop, and that he shoved Myer after White told him to calm down and go home. Only after Hinton displayed this level of resistance did Myer and White make any initial use of force to subdue Hinton. This use of force was preceded by an announcement that Hinton was under arrest and consisted only of White grabbing Hinton to keep him from leaving.[6] Cf. Dixon, 922 F.2d at 1462 (rough frisk of defendant by police officer held not excessive even though defendant was suspected of no crime where defendant's turning around and swearing could have been interpreted as resistance).
 
 
 30
 After grabbing Hinton, Myer and White increased their application of force. Not only did they wrestle him to the ground but they used a stun gun on him. However, the appellant admits at this point that he was actively and openly resisting Myer and White's attempts to handcuff him, even to the extent of biting the officers. Hinton's own expert witness on police conduct, Noah Goddard, testified that wrestling a defendant to the ground and using a stun gun are not inappropriate police practices when a suspect is resisting arrest.[7] Depos. of Noah Goddard, App. to Aple's Br. at 97, 98. Goddard testified that once a police officer sets about to effect an arrest he is obligated to complete it, and that use of a stun gun is one of the least serious methods of accomplishing this task. Depos. of N. Goddard, App. to Aple's Br. at 91, 92-95. Although Hinton points to the "numerous amounts of times" White allegedly used the stun gun to support his claim of excessive force, Hinton admits that White ceased using the gun once Myer and White had succeeded in handcuffing him. Depos. of K. Hinton, App. to Aple's Br. at 126. Accordingly, we conclude that Myer and White's use of force, even after grabbing Hinton, was not constitutionally excessive. Cf. Francis v. Pike County, 708 F.Supp. 170, 171-72 (S.D.Ohio 1988) (use of stun gun to restrain individual who resisted being handcuffed did not constitute excessive force), aff'd, 875 F.2d 863 (6th Cir.1989) (table).[8]
 
 
 31
 The cases cited by Hinton in support of his argument that Myer and White's use of force violated his constitutional rights are factually distinguishable. In none of these cases did the plaintiff engage in the type of resistance admitted to by Hinton in the instant case. For example, in Dixon v. Richer, 922 F.2d 1456 (10th Cir.1991), we held that a police officer's aggressive frisk of the plaintiff did not constitute excessive force because the plaintiff's conduct in turning around and swearing at the officer could reasonably have been interpreted as resistance. Id. at 1462. However, we concluded that the subsequent kicking, beating, and choking of the plaintiff was constitutionally excessive in light of the fact that the plaintiff had made no additional "aggressive moves or threats" toward the officer. Id. at 1463.
 
 
 32
 In conclusion, we find that Hinton has failed to demonstrate that Myer and White's conduct amounted to a violation of the law. Since this conclusion is sufficient to support the district court's finding of qualified immunity, we need not reach the issue of whether the law was clearly established at the time Myer and White's conduct occurred.
 
 
 33
 II. The City of Elwood's Entitlement to Summary Judgment
 
 
 34
 Hinton's second argument is that the district court erred in granting summary judgment to the City of Elwood. Hinton alleges that the city's failure to train adequately its officers and to adopt written regulations governing the use of force contributed to Myer and White's use of excessive force.
 
 
 35
 A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged. City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202-03, 103 L.Ed.2d 412 (1989). When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of " 'deliberate indifference' to the rights of its inhabitants." Id. at 389, 109 S.Ct. at 1205.
 
 
 36
 The district court granted summary judgment to Hinton on the ground that the city's failure to train its officers or adopt written policies was not the result of deliberate indifference. Given our conclusion that Myer and White's conduct was not constitutionally excessive, however, we do not need to reach the issue of whether the city acted with deliberate indifference.
 
 
 37
 A municipality may not be held liable where there was no underlying constitutional violation by any of its officers. City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986); Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447-48 (10th Cir.1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir.1988). In Heller, for example, the Supreme Court held that a jury verdict acquitting a Los Angeles police officer of a charge of excessive force precluded the imposition of liability on the City of Los Angeles for adopting a policy condoning the use of excessive force. The Court reasoned that where a municipality is "sued only because [it was] thought legally responsible" for the actions of its officers, it is "inconceivable" to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have "authorized" such harm. Heller, 475 U.S. at 799, 106 S.Ct. at 1573.
 
 
 38
 As in Heller, Hinton's excessive force claim against the City of Elwood seeks to hold the city liable solely because of the actions of its individual officers. Our finding that Myer and White's conduct did not violate Hinton's Fourth Amendment rights, therefore, precludes the imposition of any liability against the City of Elwood. Accordingly, we conclude that the district court properly granted summary judgment in favor of the municipality.
 
 
 39
 This conclusion is not inconsistent with our statement in prior cases that a finding of qualified immunity does not shelter a municipality from liability. See, e.g., Medina v. City and County of Denver, 960 F.2d 1493, 1499-1500 (10th Cir.1992); Watson, 857 F.2d at 697. In Medina we determined that the individual defendants were entitled to qualified immunity because the law was not clearly established, 960 F.2d at 1498-99, and in Watson we remanded for a finding on that issue, 857 F.2d at 697. When a finding of qualified immunity is predicated on the basis that the law is not clearly established, it is indeed correct that "there is nothing anomalous about allowing [a suit against a municipality] to proceed when immunity shields the individual defendants[, for] [t]he availability of qualified immunity does not depend on whether a constitutional violation has occurred." Watson, 857 F.2d at 697.
 
 
 40
 An individual municipal officer may also be entitled to qualified immunity, however, because the officer's conduct did not violate the law. When a finding of qualified immunity is predicated on this latter basis, such a finding is equivalent to a decision on the merits of the plaintiff's claim. See Siegert, --- U.S. at ---- - ----, 111 S.Ct. at 1793-94. In such a case, a finding of qualified immunity may preclude the imposition of any municipal liability. In the instant case, our finding of qualified immunity was predicated on this latter basis. Accordingly, we may properly rely on this finding to dismiss Hinton's claims against the City of Elwood.
 
 III. Wright's Entitlement to Summary Judgment
 
 41
 Hinton's final claim is that the district court erred in granting summary judgment to Wright. Hinton asserts that Wright is liable not only for failing to train adequately the City of Elwood's police officers and to adopt regulations governing their use of force, but also for failing to intervene during Myer and White's encounter with Hinton.
 
 
 42
 It is not clear from Hinton's complaint whether these claims are against Wright in her personal capacity or her official capacity. For purposes of this appeal, we assume, without deciding, that Hinton is suing Wright in both capacities. Even under this assumption, we conclude that Hinton's claims were properly dismissed by the district court.
 
 
 43
 Since a judgment against a public servant in his or her official capacity imposes liability on the entity he or she represents, Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985), an official capacity suit is simply another way of pleading an action against that entity, Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989); McGhee v. Draper, 639 F.2d 639, 642 (10th Cir.1981). Any claims against Wright in her official capacity are effectively claims against the City of Elwood, therefore, and the same rationale supporting dismissal of the latter also support dismissal of the former. See Starrett v. Wadley, 876 F.2d 808, 813 (10th Cir.1989). Accordingly, we conclude that any claims asserted against Wright in her official capacity are barred by the Supreme Court's decision in Heller.
 
 
 44
 The rationale underlying Heller would also seem to be relevant to any claims asserted against Wright in her personal capacity. However, in reaching our conclusion that any personal capacity claims against Wright are barred, we need not rely on Heller. A supervisor who is sued in his or her personal capacity is entitled to invoke the defense of qualified immunity. See, e.g., Woodward v. City of Worland, 977 F.2d 1392, 1397-1405 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). The first prong of this doctrine requires the plaintiff, in response to a motion for summary judgment by the supervisor, to establish that the supervisor's conduct violated the law. Here, Hinton does not complain that Wright acted independently against him, but rather he complains only that Wright failed to prevent Myer and White from acting unconstitutionally against him. However, we have already held that Myer and White's conduct was not unconstitutional. Thus, it follows that Wright did not act unconstitutionally in failing to prevent their conduct. We therefore conclude that any claims asserted against Wright in her personal capacity are barred on the grounds of qualified immunity, and affirm the district court's grant of summary judgment in favor of Wright.
 
 
 45
 For the reasons stated, we AFFIRM the district court's order dismissing Hinton's claims on summary judgment.
 
 
 
 [1]
 The notice of appeal lists Hinton's three minor children as additional appellants. At oral argument, however, Hinton waived appeal on behalf of his children. Thus, Hinton is the only appellant remaining in this appeal
 
 
 [2]
 The charges were apparently disposed of by means of a Diversion Agreement placing the appellant on six months' probation
 
 
 [3]
 The post-trial motions referred to in Rule 4(a)(4) consist of: 1) a motion for judgment under Rule 50(b); 2) a motion under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; 3) a motion under Rule 59 to alter or amend the judgment; and, 4) a motion under Rule 59 for a new trial. Fed.R.App.P. 4(a)(4)
 
 
 [4]
 The Fourteenth Amendment standard was more onerous than the Fourth Amendment standard, since it required a plaintiff to show that the use of excessive force was the result of malice. Frohmader v. Wayne, 958 F.2d 1024, 1027 (10th Cir.1992); Martin v. Board of County Comm'rs, 909 F.2d 402, 407 n. 5 (10th Cir.1990)
 
 
 [5]
 Our decision in the instant case is therefore consistent with our prior decisions in Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir.1990), where we analyzed a qualified immunity claim under the Fourteenth Amendment, and Dixon v. Richer, 922 F.2d 1456, 1461-62 (10th Cir.1991), where we rejected application of the Fourteenth Amendment in analyzing a qualified immunity claim after determining that the plaintiff's complaint had specifically alleged a Fourth Amendment violation. In these cases, we were concerned with the second prong of the plaintiff's summary judgment burden, whether the plaintiff had demonstrated a violation of clearly established law. Since we conclude in the instant case that the plaintiff has failed to satisfy his burden under the first prong, we do not reach the second prong
 
 
 [6]
 On appeal, Hinton concedes that both his initial stop and his subsequent arrest were valid under the Fourth Amendment
 
 
 [7]
 Goddard nevertheless maintained that White's use of a stun gun was inappropriate in the instant case. Depos. of N. Goddard; App. to Aple's Br. at 96. Goddard did not provide a reason for this conclusion
 
 
 [8]
 Although the district court in Pike County analyzed the plaintiff's claim under the due process standard subsequently rejected by Graham, there is no indication that the court relied on the subjective mindset of the officers in concluding that the officer's use of force was not constitutionally excessive