**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DELISE GRAVES; JERRY GRAVES,
Individually and as Personal
Representatives of Jerred Graves,
deceased,

      Plaintiffs - Appellants,

v.

KERMIT THOMAS, Individually and
in his official capacity as Chief of
Police of the City of Haskell,
Oklahoma; JOSH FORD, Individually
and in his Official Capacity as Police
Officer of the City of Haskell,
Oklahoma,

      Defendants - Appellees.

No. 05-7084

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 04-CIV-478-WH)**

---

Martha J. Cherbini (Albert R. Matthews and Juliet N. Brennan with her on the briefs) Bonds & Matthews Law Firm PLLC, Muskogee, Oklahoma, for Plaintiffs - Appellants.

Betty Outhier Williams, Gage & Williams, Muskogee, Oklahoma, and Scott B. Wood, Wood, Puhl & Wood, P.L.L.C., Tulsa, Oklahoma, for Defendants - Appellees.

Before **KELLY, McKAY** and **O'BRIEN**, Circuit Judges.

_____

**O'BRIEN**, Circuit Judge.

_____

Jerred Graves was killed when he lost control of his vehicle while trying to elude police officer Josh Ford at night on country roads at very high rates of speed. His parents, Delise and Jerry Graves, brought an action against Ford and Police Chief Kermit Thomas of the Haskell, Oklahoma Police Department, both individually and in their official capacities, pursuant to 42 U.S.C. § 1983. They claim Officer Ford's deliberate and unwarranted initiation of a high speed chase resulting in Jerred's death was a violation of Jerred's Fourth and Fourteenth Amendment rights. The district court concluded no constitutional violation occurred and granted summary judgment in favor of all defendants. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Standard of Review

We review the district court's grant of summary judgment *de novo*. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard,

"we examine the record and any reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Dubbs*, 336 F.3d at 1201.

In response to the Graves' claims against them in their individual capacities, Officer Ford and Chief Thomas asserted a defense of qualified immunity. This defense shields government officials performing discretionary functions from liability "if their conduct does not violate clearly established rights of which a reasonable government official would have known." *Perez v. Unified Gov't of Wyandotte County/Kansas City, Kan.*, 432 F.3d 1163, 1165 (10th Cir. 2005). Whether a defendant is entitled to qualified immunity is a two-step process. *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). First, we must determine whether Plaintiffs "ha[ve] asserted a violation of a constitutional right at all." *Id.* at 232; *see Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006). If so, we decide whether "that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1278 (10th Cir. 2003) (citation omitted). "[W]e need not reach the question of whether the individual defendants are entitled to qualified immunity if we determine, after a de novo review, that plaintiffs failed to sufficiently allege the violation of a constitutional right." *Id*.

The Graves' claim against Officer Ford and Chief Thomas in their official capacities is actually a claim against the town of Haskell (Haskell). They allege Haskell's failure to adequately train and discipline Officer Ford contributed to his

-3-

eagerness to engage in the high-speed chase. However, as a municipality, Haskell will not be held liable under § 1983 solely because its employees inflicted injury. *Monell v. Dep't of Social Servs. of the City of New York,* 436 U.S. 658, 694 (1978). Rather, to establish municipal liability, a plaintiff must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989). When the claim is a failure to act, the plaintiff must demonstrate the municipality's inaction was the result of "'deliberate indifference' to the rights of its inhabitants." *Id.* at 389. In addition, a municipality may not be held liable where there was no underlying constitutional violation by any of its officers. *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).

## II. Background

Haskell, Oklahoma, is a small town of approximately 2,000 people. On November 6, 2000, Josh Ford was hired as a police officer upon the recommendation of Police Chief Thomas. Officer Ford was CLEET certified at the time he was hired and had previously worked as a deputy sheriff for the Muskogee County Sheriff's Office.[1] Not long after Ford began working as a

---

[1] "CLEET" is the acronym for Oklahoma's "Council on Law Enforcement Education and Training," which certifies the mandatory education for Oklahoma law enforcement officers. Officer Ford was employed with the Muskogee County Sheriff's Office from July 26, 1999, through November 3, 2000. He completed his CLEET training on September 7, 2000.

patrolman, some of the citizens of Haskell became concerned with his zealous enforcement of Haskell's traffic laws. In particular, some parents of the local youth complained that Officer Ford was harassing the teenagers in town by following them with his headlights off and engaging in high-speed chases outside his jurisdiction.[2] Paradoxically, the record is devoid of any evidence of parental attempts to restrain their teenagers.

It appears one of Officer Ford's favorite targets was Charles Ginn (Ginn), Jerred Graves' best friend. Ginn drove his mother's 1996 silver Firebird with the license plate "LORRI." On at least three previous occasions, Ginn and Officer Ford engaged in a car chase which resulted in Ginn outrunning the police officer. At one point, Officer Ford informed Jerred and Ginn, "I'm going to get you, one way or the other." (Appx. at 198-99.)

After learning of Officer Ford's proclivity to engage in pursuit of Haskell's young people, Haskell Reserve Police Chief, Dallas Mathews, told Officer Ford to stop chasing the kids. He advised Officer Ford to chase them for a short time, let them go and wait until they came back to town to handle any traffic infraction which may have occurred. Mathews testified he gave this advice shortly before April 2, 2001. In addition, Mr. Graves testified Chief Thomas stated shortly after

_____

[2] Lori McVay, Charles Ginn's mother, testified that she and her husband complained to Chief Thomas about this harassment of the local boys. Her husband told Chief Thomas: "This is going to keep on and, you know, one of these boys [is] going to get killed. Something is going to happen." (Appx. at 384-85.)

Jerred's death that Chief Thomas had "told [Officer Ford] not to chase those boys, that he could get them when they came back to town. If they've got a ticket coming, to give it to them, or call their parents . . . . [Officer Ford] just didn't listen to [me]." (Appx. at 230).

At approximately 11 p.m. on April 2, 2001, Jerred and Ginn were on their way home from a friend's house. Ginn was driving his mother's silver Firebird and Jerred was driving an identical Firebird owned by his friend, Kari Beede, with the license plate "KJS-CAR." According to Ginn, he pulled over to the side of the road and Jarred pulled up beside him. Ginn told Jarred to turn his lights off because Ginn was late getting home. Jerred complied and the two cars continued down the road with Jerred in the lead until just before Ginn's driveway. At that point, Officer Ford pulled around Ginn and behind Jerred with his lights off.[3] Officer Ford then turned on his overhead lights. Jerred took off and Officer Ford pursued him. Ginn followed them to the city limits and turned around.

According to Officer Ford, he immediately radioed the Muskogee Sheriff's Office informing dispatch he was in pursuit. The Sheriff Office's log sheet indicates that Officer Ford reported he was in pursuit of a car with the license plate "LORRI." Ford chased Jerred to a point where the highway curved and

---

[3] Officer Ford claims he pulled behind Jerred's vehicle because he observed it . . . "spinning [] in three 360-degree circles." (Appx. at 118.) Because Ford's version of the events is at odds with that of the Graves we presume the Graves' version is correct for summary judgment analysis.

intersected a dirt road. Jerred continued down the dirt road, kicking up a dust trail which slowed Ford. By the time Ford got to the end of the dirt road where it again intersected with the paved highway, he had lost track of Jerred. He shut off his engine, lights and siren and rolled down the window to listen for the sound of tires. (Appx. at 186-87.) When he heard the sound of a speeding car to the north, he restarted his car and equipment and headed north.

In the meantime, Jerred was approaching an intersection with his lights off at a speed estimated at over 100 miles an hour. Unable to see Jerred's unlit car, a white truck pulled out and turned north-bound on the highway. Coming from behind, Jerred swerved to avoid the truck, lost control, overcorrected and hit an obstacle on the other side of the highway. His car went airborne, flipped and rolled into a field. The occupants of the white truck and a second vehicle pulled to the side of the road to give assistance. Officer Ford arrived shortly thereafter and called for rescue. Jerred was life-flighted to St. John Medical Center in Tulsa, where he died on April 3, 2001.

Although the Haskell Police Department had a pursuit policy, Officer Ford admitted he had never read it. Officer Ford had, however, taken a "Law Enforcement Driver Training" course during his CLEET training. Officer Ford resigned from the Haskell Police Department on April 24, 2001.

The Graves filed a complaint on October 25, 2004, alleging violations of the Fourth Amendment, the Fourteenth Amendment and the failure to provide

adequate training and/or supervision. Officer Ford and Chief Thomas filed motions for summary judgment. Both asserted qualified immunity, arguing no constitutional violation occurred. The district court determined the Graves' Fourth Amendment claim was precluded by established precedent.[4] The court further concluded Ford's behavior was not arbitrary and the facts did not shock the conscience of the court, thereby negating the Graves' Fourteenth Amendment substantive due process claim and warranting summary judgment in Ford's favor. The district court then granted summary judgment to Chief Thomas and Haskell because they had no liability in the absence of a violation of Jerred's constitutional rights. This timely appeal followed.

### III. Discussion

The Graves challenge only the district court's conclusion that they failed to raise a material issue of fact as to whether the actions of Officer Ford and, in turn, Chief Thomas and Haskell, violated Jerred's substantive due process rights under the Fourteenth Amendment.

The Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he touchstone of due process is protection of the individual against

---

[4] *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (Failure to comply with an order to halt was not a seizure.) ; *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) ("[N]either usage nor common-law tradition makes an *attempted* seizure a seizure.") (quoting *Hodari D.*, 499 U.S. at 626).

arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 845-46 (internal quotations and citations omitted). "Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998) (quotation and citation omitted).

"The 'ultimate' standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges." *Moore*, 438 F.3d at 1040 (internal quotations omitted). When applying this standard, "we must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir. 1995) (internal citations omitted); *see Radecki v. Barela*, 146 F.3d 1227, 1229-30 (10th Cir. 1998). Although "the conscience-shocking standard is difficult to define and to pinpoint," the standard is not met by official negligence. *Id.*

The Supreme Court's decision in *Lewis* is the starting point when

considering a substantive due process claim resulting from a highspeed chase. In *Lewis* a California patrolman pursued two teens on a motorcycle when they refused to heed his command to stop. 523 U.S. at 836. "The motorcycle and patrol car reached speeds up to 100 miles an hour, with [the officer] following at a distance as short as 100 feet; at that speed, his car would have required 650 feet to stop." *Id*. at 837. When the motorcycle driver made a sharp turn, the passenger fell off. The officer, unable to stop, hit and killed the passenger. *Id*.

Acknowledging substantive due process may apply to situations where an executive abuse of power has occurred, even though there was no seizure, the Court nevertheless concluded the facts in *Lewis* did not establish the required intent. *Id.* at 836. It concluded a "cognizable level of executive abuse of power [is] that which shocks the conscience," *id.* at 846, and police behavior in high-speed pursuits only rises to that level when there is "a purpose to cause harm unrelated to the legitimate object of arrest," *id.* at 836, "or to worsen [the victim's] legal plight." *Id*. at 854. Applying this standard, the Court determined the officer was presented with a violation of the law for which he was not to blame and to which his reaction was "instinctive." *Id*. at 855. The Court recognized that prudence may have counseled a different response, but there was "no reason to believe that [the officer's actions] were tainted by an improper or malicious motive. . . ." *Id*.

*Lewis* recognized actions demonstrating the level of culpability required in

substantive due process claims must be considered in the context of the claim, saying, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id*. at 850. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed." *Perez*, 432 F.3d at 1166 (internal quotations omitted). However, "when actual deliberation is practical," we will employ a "deliberate indifference" standard. *Lewis*, at 851; *Radecki*, 146 F.3d at 1231.

The Graves allege the district court ignored the most critical question of fact in this case–Officer Ford's motive in attempting to stop Jerred. The Graves point to Ginn's testimony denying Jerred had been driving recklessly prior to the stop[5] and the evidence of Ford's predilection to "harass" the teenagers, especially

---

[5] Ginn testified:
I pulled over to the side of the road, and Jerred pulled next to me. I told him to turn his lights out because I was late getting home. And then he went on right – he went on. Right before we got to Mom's driveway here come[s] Josh [Officer Ford] around me with his lights off and got right on Jerred, and flipped his top lights on Jerred.

(Appx. at 206.) Thus, according to Ginn, Jerred was driving on the street at approximately 11 p.m. with his lights out in violation of 47 Okla. Stat. § 12-201 (1961) (all vehicles on a public road must display lights "[a]t any time from one-half (1/2) hour after sunset to one-half (1/2) hour before sunrise, also referred

-11-

Ginn, by following them with his headlights off and engaging them in high-speed chases. They highlight Officer Ford's alleged statement that he was "going to get" Jerred and Ginn "one way or the other" and the inference that Officer Ford actually thought he was chasing Ginn when he reported the wrong license plate to the Muskogee Sheriff's dispatch. The Graves contend this evidence is sufficient for a jury to infer the attempted traffic stop was intentionally designed to induce a high speed chase, demonstrating Officer Ford's intent to harm and/or worsen Jerred's legal plight. They also maintain Jerred's later legal violations cannot legitimize such pursuit because he was merely exercising his common-law right to resist an unlawful arrest. As a result, the Graves argue the district court erred in requiring they show both the requisite intent and that Officer Ford's *actions* rose to a level which "shocks the conscience." An "exact analysis" of the Graves' claims reveals two separate decisions at issue here–the decision to attempt a traffic stop and the decision to engage in pursuit.

### A. The Decision to Make a Traffic Stop

Although it seems a bit far-fetched, for the purpose of summary judgment we will assume a jury could believe Officer Ford's testimony that Jerred did not turn his lights off until Officer Ford pulled behind him, but not credit Officer Ford's testimony about Jerred's reckless driving before the stop. So construed,

to in this chapter as nighttime."). Officer Ford, however, stated Jerred extinguished his lights immediately after Officer Ford turned on his overhead lights. (Appx. at 118).

the decision to pull behind Jerred and turn on overhead lights was a product of actual deliberation thus triggering a deliberate indifference analysis of Ford's mental state (looking for a purpose to cause harm unrelated to the legitimate object of arrest). However, even assuming Ford was deliberately indifferent to Jerred's Fourteenth Amendment rights in attempting a traffic stop, his actions are not conscience shocking.

Contrary to the Graves' contention, a culpable mental state, alone, is insufficient to establish a violation of substantive due process. *Lewis,* 523 U.S. at 847 n. 8 (to establish a substantive due process violation, plaintiffs must show that "the behavior of the [] officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."); *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 528 (10th Cir. 1998) ("[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.") (citation omitted); *Armijo By & Through Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1263 (10th Cir. 1998) ("The key to the state-created danger cases . . . lies in the state actors' culpable knowledge *and conduct* in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.") (emphasis added); *see also Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005) ("Not all deliberately indifferent conduct is conscience shocking in the constitutional sense of the

term.").

The conduct resulting from Ford's presumed culpable state of mind was merely to pull up behind Jerred and turn on his overhead lights, nothing more. Jerred knew Ford was acting as a police officer and nothing in the record suggests the traffic stop placed Jerred in fear for his physical well-being. *Cf. Checki v. Webb*, 785 F.2d 534, 535 (5th Cir. 1986) ("Neither Checki nor his driver knew that the [tailgating] Oldsmobile was an unmarked state police vehicle, or that the men inside were state troopers Allison and Webb."). Jerred alone made the decision to flee, either to avoid an encounter with Ford (and, possibly, a traffic ticket) or to instigate a round of high-speed cat and mouse. Ford may have anticipated, even relished, Jerred's irrational response to his presence, but he did nothing to compel it. He cannot be held accountable for Jerred's failure to exercise reasonable self-restraint. That brings us to discussion of Ford's second decision, pursuit.

B.      *The Decision to Engage in Pursuit*

The decision to pursue Jerred is squarely within the territory explored in *Lewis*. As in *Lewis*, Officer Ford was faced with an unexplained flight from an attempted traffic stop. Therefore, the Graves must show Officer Ford's reaction was motivated by "a purpose to cause harm unrelated to the legitimate object of arrest" or worsen Jerred's legal plight. *Lewis,* 523 U.S. at 836, 854. The Graves again point to their evidence that Officer Ford did not see a traffic violation prior

-14-

to stopping Jerred and his statement that he "was going to get" Ginn and Jerred.[6]
As explained above, Ford's statement is insufficient to justify Jerred's high-speed
flight. The Graves also contend "[t]here is absolutely no evidence in this case,
except for [] [Officer] Ford's testimony, that Jerred committed any violation of
any law prior to [Officer] Ford initiating the pursuit." (Appellant's Br. at 11.)
We disagree.

Ginn's testified: "[a]nd [Ford] flipped his top lights on Jerred. And they
went out of town." (Appx. at 206.) Because Ginn very carefully avoided any
discussion of Jerred's specific conduct after Officer Ford turned on his overhead
lights, Ford's testimony is undisputed. Ford said Jerred drove off without
headlights at a "high rate of speed" prior to pursuit. (Appx. at 118.) Thus, the
undisputed evidence demonstrates Jerred was in the process of violating traffic
laws and eluding a police officer at the time Ford initiated pursuit. The district
court considered the pursuit justified. Jerred supplied, in spades, a "legitimate
object of arrest" and the record fails to legitimately suggest an intent of Ford to
cause harm unrelated to the arrest.

---

[6] The Graves attempt to shroud Ford's statement with malevolent intent. A
more benign interpretation is at least as plausible—Ford hoped to catch and arrest
Jerred and Ginn in the commission of criminal acts (traffic laws included). Even
assuming Ford wanted to provoke Jerred into a reckless, high speed attempt to
elude him, that is not enough. It is also necessary that Ford intended (or, at least,
that it was highly probable, bordering on certainty) for Jerred to be harmed in the
process. On this record it stretches credulity beyond elastic limits to infer so
much from those words.

The Graves take issue with the district court's conclusion that pursuit was justified, arguing Jerred's actions were acceptable efforts to resist Officer Ford's attempt to make an unlawful arrest and, given his legitimate resistance, pursuit was not justified. Assuming, arguendo, that the Graves' conclusion (officer may not give chase) logically follows the premise (juvenile's attempt to elude police by engaging in illegal conduct is permissible), their justifications for Jerred's decision to elude Ford via reckless and high-speed flight falls short. We begin by noting a routine traffic stop is not equivalent to an arrest. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (while "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment, . . . [w]e have held that a routine traffic stop is more analogous to an investigative detention than a custodial arrest. We therefore analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio,* 392 U.S. 1 (1968)") (internal quotations and citations omitted).[7] The Graves fail to cite to any case

---

[7] Oklahoma recognizes a common-law right to resist arrest, but differentiates between an attempted arrest and an investigatory detention. *See Castellano v. State*, 585 P.2d 361 (Okla. Crim. App. 1978) ("If the officer is momentarily detaining a person in order to make an inquiry so as to determine his identity and obtain more information, and is in no way attempting to restrain him of his liberty or take him into custody, then the stop does not constitute an arrest, but, rather, is an investigatory detention."). In this case, we need not determine whether Oklahoma would find the common-law right to resist arrest applies to investigatory stops. However, the vast majority of states which have considered the issue have either statutorily or judicially rejected a right to resist an investigatory stop and, in many cases, the right to resist arrest in any situation. *See Faulkner v. State*, 627 S.E.2d 423, 425 (Ga. Ct. App. 2006) ("We do not leave the determination of whether there is a legal basis for a traffic stop to the driver.

-16-

law approving highspeed resistance to an attempted traffic stop initiated by a

uniformed officer in a marked police car. Indeed, the Supreme Court has advised:

> We do not think it desirable, even as a policy matter, to stretch the
> Fourth Amendment beyond its words and beyond the meaning of
> arrest . . . . Street pursuits always place the public at some risk, and
> compliance with police orders to stop should therefore be
> encouraged. Only a few of those orders, we must presume, will be
> without adequate basis, and since the addressee has no ready means
> of identifying the deficient ones it almost invariably is the
> responsible course to comply.

*Hodari D.*, 499 U.S. at 627.

Even if the Oklahoma courts would extend the common-law right to resist

an unlawful arrest to a traffic stop, Jerred's actions fell outside the parameters of

lawful resistance. The right to resist is limited to "such force as [is] absolutely

necessary to resist an attempted illegal arrest." *Bad Elk v. United States*, 177

U.S. 529, 537 (1900).[8] Jerred's actions after Officer Ford signaled Jerred to pull

---

To hold otherwise could encourage persons to resist the police and create
potentially violent and dangerous confrontations.") (internal quotations and
citations omitted)); *State v. Windus*, 86 P.3d 384, 387 n.3 (Ariz. Ct. App. 2004);
*State v. Sims*, 851 So.2d 1039, 1047 (La. 2003); *State v. Howell*, 782 N.E.2d
1066, 1067-68 (Ind. Ct. App. 2003); *Com v. Hill*, 570 S.E.2d 805, 808 (Va. 2002);
*State v. Coleman*, 630 N.W.2d 686, 697 (Neb. Ct. App. 2001); *Abrams v. Walker*,
165 F.Supp.2d 762, 767 (N.D.Ill. 2001); *State v. Weigmann*, 714 A.2d 841 (Md.
1998)(listing case cites and statutory authorities abolishing the right to resist
arrest in any circumstance); *State v. Dawdy*, 533 N.W.2d 551, 555-56 (Iowa
1995)(adopting the Eighth Circuit's holding in *United States v. Dawdy*, 46 F.3d
1427 (8th Cir. 1995).

[8] *See also, Brown v, City of Oklahoma City, Okla.*, 721 P.2d 1348, 1352
(Okla. Civ. App. 1986) (In light of the police officer's racist and egregious
behavior in effecting the illegal seizure of the plaintiff's car and the plaintiff's
arrest, the plaintiff's "defiance of and interference with the wrecker driver's

over were excessive and unnecessary under the circumstances. Nothing of record suggests Jerred was going to be arrested and taken into detention. Rather, the most dire consequence of the attempted stop prior to Jerred's "resistance" was the possibility of an allegedly unwarranted traffic violation–a matter that is normally and dispassionately addressed in a courtroom.[9]

The Graves also generally assert evidence of Officer Ford's intent to "worsen [Jerred's] legal plight." Assuming (without conceding) this argument was adequately raised, we find the Eighth Circuit's reasoning in *Slusarchuk v. Hoff* persuasive:

> We decline to read the term expansively, as [the Graves] urge, because every police pursuit is intended to "worsen [the] legal plight" of the suspect by arresting him. Thus, a broad reading would eviscerate the intent-to-harm standard . . ., at least in part, to sharply limit substantive due process liability. Rather, we construe the term as applying only to a narrow category of pursuits that reflect a conscience-shocking motive beyond the realm of legitimate

---

molestation of her car was not excessive."); *Sandersfield v. State*, 568 P.2d 313, 315 (Okla. Crim. App. 1977) ("[T]he right to resist an unlawful arrest is limited and varies with the circumstances."); *Walters v. State*, 403 P.2d 267, 275 (Okla. Crim. App. 1965) ("The right to resist an unlawful arrest is limited and varies with the circumstances."); *Billings v. State*, 166 P. 904, 906 (Okl. Crim. App. 1917) ("If an attempted arrest be unlawful, the party sought to be arrested may use such reasonable force, proportioned to the injury attempted upon him, as is necessary to effect his escape, but no more; and he cannot do this by using, or offering to use, a deadly weapon, if he has no reason to apprehend a greater injury than a mere unlawful arrest.").

[9] The only testimony on this point is Officer Ford's. In his deposition, he was asked if, at the time he attempted to stop Jerred, he intended to give him a ticket for reckless driving which Jerred could have paid and gone on. Ford replied in the affirmative. (Appx. at 184.)

government action but do not involve an intent to inflict physical harm. The pursuit in this case reflects no such motive.

346 F.3d 1178, 1183 (8th Cir. 2003), *cert. denied*, 541 U.S. 988 (2004).

The Graves also argue the district court erred in granting summary judgment to Chief Thomas and Haskell. "A supervisor who is sued in his or her personal capacity is entitled to invoke the defense of qualified immunity." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 783 (10th Cir. 1993). The plaintiff must establish that the supervisor's conduct violated the law. *Id*. The Graves do not claim Chief Thomas took any personal action against Jerred, but rather that Chief Thomas failed to prevent Officer Ford from acting unconstitutionally. Because we hold Officer Ford's conduct was not unconstitutional, Chief Thomas did not act unconstitutionally in failing to prevent such conduct. *Id*. Likewise, our conclusion precludes the imposition of any liability against Haskell. *Id*. at 782 ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").

AFFIRMED.