# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 06-1771

FLOYD STEEN, personal representative of
the estate of BRANDON S. HILBERT,

*Plaintiff-Appellant,*

*v.*

ROBERT MYERS, BRAD RIDENOUR, and
CITY OF PORTLAND, INDIANA,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 04 C 174—**Theresa L. Springmann**, *Judge.*

————————

ARGUED DECEMBER 8, 2006—DECIDED MAY 21, 2007

————————

No. 06-1772

RICHARD PHILEBAUM and TERESA PHILEBAUM,
as legal guardians of ROBYN A. PHILEBAUM,
and ROBYN A. PHILEBAUM individually,

*Plaintiffs-Appellants,*

*v.*

CITY OF PORTLAND, INDIANA, PORTLAND
POLICE DEPARTMENT, ROBERT MYERS,
and BRAD RIDENOUR,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 04 C 218—**Theresa L. Springmann**, *Judge.*

—————————

ARGUED DECEMBER 8, 2006—DECIDED MAY 21, 2007

—————————

Before BAUER, FLAUM, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*  The plaintiffs in this combined appeal represent the interests of a young man who was killed and a young woman who was rendered disabled in a motorcycle accident that occurred during a police chase. They brought suit in the state courts of Indiana, combining both federal and state law claims. The defendants removed the cases to the federal court. The district court entered summary judgment in favor of the defendants on the federal claims and remanded the state law claims to the state courts. The plaintiffs appeal. We affirm.

## I. BACKGROUND

Because this appeal comes to us after a grant of summary judgment in favor of the defendants, we will recount the facts in the light most favorable to the plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In the early morning hours of July 18, 2003, Portland, Indiana police officers Robert Myers and Brad Ridenour were on duty. Myers observed Brandon Hilbert and an unknown woman (now known to have been plaintiff Robyn Philebaum) sitting on a parked motorcycle among a crowd of other young people on Main Street in Portland. Suspecting that Hilbert's license was suspended, and further suspecting that he did not possess a valid motorcycle endorsement, Myers proceeded past the motorcycle and parked his patrol car while running a check on the

status of Hilbert's license. Either on his own or acting pursuant to information from Ridenour (the details are unclear), Myers drove a few blocks South and East to find the motorcycle parked at a new location. He drove past the parked motorcycle and the two youths at least once, and perhaps twice or more. He parked out of sight again and awaited confirmation about the status of Hilbert's license via computer. He had positioned himself, he says, to be in a location to notice the motorcycle if it returned to the original Main Street location. While waiting, he received confirmation that Hilbert's license was suspended and that he had no motorcycle endorsement.

We should note here the context in which these events occurred—events which the appellants characterize as a cat-and-mouse game. Hilbert and Myers had a prior history. A few months before the night in question, Myers and another officer had handcuffed Hilbert and held him at gunpoint in the course of investigating an armed assault. Although Hilbert's physical description seems to be a far stretch from the description of the assault suspect, his pick-up truck was similar to a vehicle associated with that assault. Myers and the other officer eventually released Hilbert when it became apparent that he was not the suspect wanted in connection with the assault. Nevertheless, it appears from testimony of relatives that this run-in with Myers had the effect of leaving Hilbert in fear of Myers, and the appellants suggest that the prior events provide important context for the events of July 18.

Not seeing Hilbert and his passenger returning to Main Street, Myers started to drive back to Hilbert's last known location. He saw Hilbert and Philebaum riding on the motorcycle. Hilbert looked at him, and then turned East on Water Street (Indiana Highway 26) and sped away. Myers testifies that he turned on his lights and siren and

attempted to complete a traffic stop, but Hilbert did not pull over. Myers gave chase, and Ridenour joined him, trailing some distance behind.

The chase would end tragically. Within minutes, the chase had reached speeds between 100 and 130 miles per hour. Approximately six minutes after Hilbert and Philebaum had fled, the chase ended with the motorcycle leaving the road. Hilbert died, and Philebaum received extensive injuries. The chase was witnessed by ten people. Four are parties to the current lawsuit: defendants Myers and Ridenour, and plaintiffs Hilbert (through his estate) and Philebaum (through her parents). Two additional people were eyewitnesses to the chase: Barbara Ashcraft lives near the city limits and saw the vehicles as they were leaving town and Rhonda Bartle passed the chase while driving westbound (into Portland) on Highway 26. In addition, four people were "ear-witnesses" to the chase: the Campbells and the Schweitermans live along Highway 26 between Portland and the crash site.

Myers's report of the chase and his affidavit estimate that the distance between his car and the motorcycle ranged from one block behind the motorcycle at the inception of the traffic stop to as much as one-quarter or one-half a mile throughout the remainder of the chase. Myers's in-car video camera was not operating at the time of the chase, and thus provides no useful evidence. It appears that the video recorder was repaired the morning before the chase, and Myers was unaware that it was usable once again. Ashcraft and Bartle (the only non-party eyewitnesses) estimate that the distance between the vehicles to have been between one car length as the chase left town, to three or four car lengths toward the end of the chase. The witnesses who only heard the chase, but did not see all three vehicles, estimated that the time between the sound of the motorcycle passing and the sound of the pursuing police car was about ten seconds.

About four minutes into the chase, and about two minutes before its eventual tragic end, Myers suggested that the dispatch operators call across the state line to the Mercer County (Ohio) sheriff and inform them that the chase would be entering their jurisdiction. Myers received a radio call from the Jay County (Indiana) sheriff's department reminding him that he was approaching a point where the highway makes a right-hand curve. He testifies that he slowed, and observed the motorcycle braking ahead of him before leaving the highway, having failed to make the right-hand turn. The accident reconstruction report calculated that Hilbert was traveling seventy-four miles per hour when he left the highway in a straight line, and that the tires left skid marks for over forty-six feet before leaving the pavement.

Hilbert's estate and Philebaum's parents (as her legal guardians) brought suit in Indiana state court against Myers, Ridenour, the City of Portland, and the Portland Police Department. Their complaints alleged federal causes of action under 42 U.S.C. § 1983 for depriving the plaintiffs of their constitutional rights under the Fourth Amendment and Fourteenth Amendment and various state law claims. The defendants removed the case to the federal court and eventually moved for summary judgment. The plaintiffs acknowledged the insufficiency of the evidence to support any claim against Ridenour and did not oppose summary judgment on the claims against him. The plaintiffs also withdrew their claims against the City of Portland and conceded that the Portland Police Department is not a separate entity subject to suit. The district court entered summary judgment in favor of the defendants on the § 1983 claims and remanded the state law claims to the state court. The plaintiffs appeal. Their statement of issues for our consideration, as well as their arguments, are confined to whether summary judgment was appropriate with respect to defendant Myers. Al-

though they do not say so explicitly, we take it from the absence of any discussion of Ridenour or the City that they have abandoned their federal claims against those defendants. *Luellen v. City of E. Chicago*, 350 F.3d 604, 612 (7th Cir. 2003) (holding arguments not made in the appellant's brief are forfeited).

## II. ANALYSIS

We review a decision to enter summary judgment *de novo. Barrows v. Wiley*, 478 F.3d 776, 779 (7th Cir. 2007). We view the facts and draw all inferences in the light most favorable to the non-moving party—in this case the plaintiffs. *Liberty Lobby*, 477 U.S. at 255. Summary judgment is appropriate where the evidence in the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The Fourteenth Amendment requires that the states not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. A person who, "under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. The parties agree that our consideration of § 1983 claims in the context of a police chase of a motorcycle is largely controlled by the Supreme Court's holding in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

*A.  Fourth Amendment Claim*

In the context of a police pursuit, a Fourth Amendment seizure does not occur unless an officer intentionally and forcibly halts the fleeing suspect. *Id.* at 844, ("[A] Fourth Amendment seizure [occurs] only when there is a governmental termination of freedom of movement through means intentionally applied. . . . [N]o Fourth Amendment seizure would take place where a pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit, but accidentally stopped the suspect by crashing into him.") (citing *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (internal quotations omitted)). *See also Scott v. Harris*, 550 U.S. ___ (2007) at *8.

It is unclear from the appellants' briefs whether they continue to press the argument that their Fourth Amendment claim should have survived summary judgment. The references they make to that amendment are fleeting and insubstantial. Normally we would be inclined to consider the argument forfeited. *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). However, the question of whether Myers rammed the motorcycle is pertinent to the appellants' arguments under the Fourteenth Amendment also, so we will review the district court's consideration of the question despite the sparse argument presented to us on appeal.

The district court concluded that the allegation that Myers had struck the motorcycle was "unsupported speculation." *Philebaum v. Myers*, No. 1:04-CV-00218, 2006 WL 335518, at *11 (N.D. Ind. Feb. 13, 2006). In reaching that conclusion, the district court considered photographic evidence of the condition of the motorcycle and the police

car's bumper. It also considered the testimony of the witnesses who had seen the police car following danger-ously close to the motorcycle. It considered the absence of a videotape from Myers's car and whether that might provide circumstantial evidence that damning evidence was destroyed. The appellants also urge us to consider the chase in the context of the cat-and-mouse events prior to the chase and the possible bad blood between Hilbert and Myers.

In the end, we agree with the district court that no reasonable jury could find that Myers violated the appel-lants' Fourth Amendment rights. As the Court in *Lewis* held, the plaintiff in a § 1983 case derived from a police chase has the burden of proving two things: that the officer forcibly stopped the vehicle and that the contact was intentional. *Lewis*, 523 U.S. at 844. The appellants here have failed to bring forth any evidence that there was any contact between the motorcycle and Myers's police car. They argue that "if plaintiffs can establish at trial" that the collision occurred or Myers forced the motorcycle off the road, the Fourth Amendment claim survives. But we have consistently held that summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005) (internal citations omitted).

Even if we were to credit the testimony about the par-ties' history of antagonism, and even if we resolve the conflict between witnesses about how close Myers was following the motorcycle in favor of the appellant's version (as we must at this stage of the proceedings) this only provides evidence to allow an inference about whether a collision might have been intentional. We would draw that inference in the light most favorable to the appellants, but

there remains simply no evidence that any collision occurred to begin with. Even the most damning evidence of a nefarious motive (which this is not) does not overcome the fact that the plaintiffs have provided no evidence that any seizure within the meaning of the Fourth Amendment has occurred. We do not allow parties to send every speculation that they have to the jury despite an absence of evidence. The district court's entry of summary judgment on the Fourth Amendment claim was correct.

## B. *Fourteenth Amendment Claim*

The parties' arguments on the Fourteenth Amendment claim are more robust, and we turn now to that question. *Lewis* establishes a heavy burden for a plaintiff to bear when making a § 1983 claim based on the Fourteenth Amendment. "To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 U.S. at 846. The district court found that the conduct in question did not rise to the level of shocking the conscience and entered summary judgment for the defendants.

We recount here the evidence that the appellants argue demonstrates that Myers's behavior shocks the conscience. First, they note the altercation between Myers and Hilbert that occurred a few months before the chase. Although they do not apparently argue that the incident itself is conscience-shocking, they offer it as proof of animosity and perhaps a nefarious motive. They argue that such a history, and Hilbert's apparent fear of Myers in its wake, might allow a jury to infer that Myers had an improper motive on the night in question. They also note the "cat-and-mouse" aspect to the events that immediately preceded the chase, going so far as to characterize Myers's actions as stalking the plaintiffs. They further note that Myers could have prevented the chase if he had accosted

the youths while they were still parked instead of waiting for confirmation of Hilbert's license status or to see them driving the motorcycle. They speculate that Myers was lying in wait to initiate the traffic stop at a place that would maximize embarrassment for Hilbert.

They also criticize Myers's decision to initiate a high-speed chase once Hilbert fled. They argue that because Hilbert's identity was now known to the officers they could have terminated the chase and tracked him down later to issue a citation and impound the motorcycle. Portland is, after all, a small town. They argue that Portland's pursuit policy supports terminating the pursuit once the driver has been identified and that Myers should have weighed the risks associated with the pursuit against the benefit of apprehending the unlicensed and fleeing rider.

Finally, they criticize the way Myers conducted the pursuit. They argue, based on several eyewitnesses, that he was following too closely. They also suggest that even if the original chase were reasonable, that Myers had six minutes to reconsider and to decide to stop the pursuit based on weighing the risks and the rewards. Taking all of this evidence, they argue that Myers behaved in a conscience-shocking manner because he was motivated by personal animosity and a desire to inflict harm on Hilbert, which led him to violate departmental policy and common sense by continuing a high-speed pursuit for a minor traffic violation.

The appellees see matters differently, of course. But at this stage, we are bound to view the facts in the light most favorable to the appellants and to draw inferences in their benefit. Nevertheless, the appellees also muster a number of legal arguments to support the conclusion that these actions do not shock the conscience. We have held before that liability under this standard generally requires

"deliberate action intended to harm another." *Bublitz v. Cottey*, 327 F.3d 485, 491 (7th Cir. 2003). We have held that "the *sine qua non . . .* is a purpose to cause harm." *Id.* (citing *Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998)). The Court in *Lewis* instructs us that conscience-shocking behavior is likely to be found where the "conduct [is] intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849.

We agree with our sister circuit in holding that even a minor traffic stop, and pursuit of a fleeing suspect after an unexplained flight from that stop, is a legitimate government interest. *Graves v. Thomas*, 450 F.3d 1215, 1223-24 (10th Cir. 2006). *Graves* also involved an officer whose motive for making the stop might have been suspect. *Id.* at 1222-24. As for the argument that Myers could have stopped the chase and tracked down Hilbert the next day, we believe that this is an argument that goes to the question of whether the pursuit was wise, not whether it violated the Constitution.

The question of whether Myers's training indicated that he should stop the pursuit likewise does not raise questions that implicate the Constitution. Various sections of the pursuit manual are quoted by both sides to support arguments about whether Myers complied with department directives. As the Court in *Lewis* noted, however, a failure to comply with departmental policy does not implicate the Constitutional protections of the Fourteenth Amendment. 523 U.S. at 838-39. The Ninth Circuit in *Lewis* had reversed summary judgment in favor of the defendants, largely on grounds that their failure to comply with department regulations raised a genuine issue of material fact as to whether the behavior was deliberately indifferent. *Id.* The Supreme Court reversed the Ninth Circuit, holding that regardless of whether those policy violations might give rise to a claim of deliberate

indifference, they did not rise to the level of shocking the conscience. *Id.* at 855.

The question for us, therefore, is whether there is sufficient evidence of some intent to harm that goes beyond the traffic stop, the decision to pursue, and the decision to not terminate the pursuit at some point before the crash. We find no evidence of that intent. The appellants' strongest case is made by the eye-witness accounts of the chase. The testimony of the eye-witnesses is more damning than the testimony of Myers or the ear-witnesses. Because a jury might find that the eye-witnesses were more credible, we will assume their version of events. Although we make no judgments here of witness credibility, *see Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), for the purposes of this appeal we will assume that Myers conducted the pursuit at speeds upwards of 130 miles per hour within one to three car lengths of the fleeing motorcycle. This assumption lands us squarely between *Lewis* and *Checki v. Webb*, 785 F.2d 534 (5th Cir. 1986). Although *Checki* predates *Lewis*, and comes to us from another circuit, we consider it for persuasive purposes, particularly in light of the fact that the Court in *Lewis* cited to it with approval. 523 U.S. at 854 n.13.

In *Checki*, a motorist on a Louisiana highway noticed a car in his mirror that appeared to contain two men in cowboy hats and a woman. 785 F.2d at 535. The trailing car, actually an unmarked police car, followed him for upwards of twenty miles at distances as close as two feet. *Id.* Not knowing that the car was a police vehicle, the motorist attempted to flee. *Id.* Eventually the officers turned on their lights and siren, giving the first indication that they were attempting to stop the car. *Id.* By this point, the motorist apparently (and understandably) was not entirely convinced that the pursuing car was a legitimate police vehicle. He fled for another ten miles or so,

before being stopped by a state police road block. *Id.* at 535-36. After Checki was handcuffed, the trailing officers arrived, handcuffed him, pistol-whipped him, and broke his passenger's arm. *Id.* at 536. The court in *Checki* remanded for trial, holding that "where a police officer uses a police vehicle to terrorize a civilian, and he has done so with malicious abuse of official power shocking to the conscience, a court may conclude that the officers have crossed the constitutional line". *Id.* at 538.

By contrast, the facts in *Lewis* are similar to the confrontation between Myers and Hilbert. In *Lewis*, the police made it clear from the beginning of the chase that they were attempting to pull the motorcycle over. 523 U.S. at 836-37. They used their lights and sirens. *Id.* at 837. They followed at speeds up to 100 miles per hour and trailed by as little as 100 feet. *Id.* The Court found that the police did not violate Lewis's Fourteenth Amendment rights by initiating or continuing the pursuit because this behavior did not rise to the conscience-shocking extreme such as the officers' in *Checki* did. *Id.* at 854-55. Even taking the facts and inferences in the light most favorable to the appellees, Myers's behavior does not shock the conscience as the Court has established that standard in *Lewis*.

## III. Conclusion

The Supreme Court has set the bar awfully high in pursuing a Fourteenth Amendment claim that arises out of a police chase. There might be questions on this record as to whether Myers was negligent, reckless, or even deliberately indifferent to the safety of Hilbert and Philebaum, but under the standard set forth in *Lewis* those questions are reserved to the state courts and the law of tort. Under a standard that requires conscience-shocking behavior and an intent to cause harm unrelated

to a legitimate government interest, the district court was correct that the defendants were entitled to judgment as a matter of law on the claims under 42 U.S.C. § 1983. Accordingly, the decision of the district court is AFFIRMED.

A true Copy:

      Teste:

                            _____

                            *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*