**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 28, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY, a
New Hampshire corporation,

    Plaintiff-Appellant,

v.

CORRECTIONAL MEDICAL
SERVICES, INC., a Missouri
corporation; BRUCE KAHN, J.D.,
M.D., a Utah resident; STEPHEN
GOLDMAN, a Wyoming resident,

    Defendants-Appellees.

No. 05-8038
No. 05-8082

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(No. 03-CV-1039-B)**

_____

Russell F. Watters of Brown & James, P.C., Saint Louis, Missouri (T. Michael
Ward of Brown & James, P.C., Saint Louis, Missouri; and Peter J. Young of
Schwartz, Bon, Walker & Studer, L.L.C., Casper, Wyoming with him on the
briefs), for Plaintiff-Appellant.

Dennis E. O'Connell (Thomas C. Walsh with him on the brief), of Bryan Cave
LLP, Saint Louis, Missouri, for Defendants-Appellees.

_____

Before **LUCERO**, **McCONNELL** and **HOLMES**, Circuit Judges.

_____

**HOLMES**, Circuit Judge.

_____

The Estate of Orlando Patrick Roan Eagle ("Roan Eagle") sued Correctional Medical Services, Inc., Bruce Kahn, J.D., M.D. and Stephen Goldman (collectively "CMS") for alleged medical malpractice. National American Specialty Insurance Company ("NAS"), CMS's insurer, declined to defend or indemnify CMS, but nonetheless agreed to settle the matter on CMS's behalf. NAS then filed this action seeking a declaratory judgment that it had no duty to defend or indemnify CMS, and to recoup the settlement proceeds. CMS filed a counterclaim for, among other things, breach of contract.

On cross-motions for summary judgment, the district court determined that the NAS policy provided coverage for the Roan Eagle claim, denied NAS's claim for reimbursement of the settlement proceeds, and found NAS liable for CMS's defense costs and attorney's fees. The district court, by later order, required NAS to pay CMS $118,219.82 in damages. NAS appealed from both orders.

We conclude that, although the district court's order resolving the cross-motions for summary judgment was not a final order pursuant to 28 U.S.C. § 1291, the district court's order awarding damages is a final order subject to our review. We further conclude that the district court properly determined that NAS was liable, under the terms of its policy, for CMS's defense costs and attorney's fees in the Roan Eagle litigation. We therefore **AFFIRM**.

-2-

# I.

## A. *Factual Background*

CMS provided health care and staffing to the Wyoming State Penitentiary ("Penitentiary"). On July 3, 2000, while CMS was insured by PHICO Insurance Company ("PHICO"), Mr. Roan Eagle, a Penitentiary inmate, committed suicide while under the care of a CMS doctor. Subsequently, on July 20, 2000, Lawyers and Advocates for Wyoming ("LAW"), a not-for-profit public interest law firm, sent a letter to the Wyoming Department of Corrections requesting records, including medical records, related to Mr. Roan Eagle's death. Specifically, LAW asked for "a complete copy of all city, county, state and/or federal records . . . pertaining to" Mr. Roan Eagle's death. Aplt. App. at A-309. LAW further advised that the letter was intended to put the Wyoming Department of Corrections "on notice that all materials related to this incident shall not be destroyed, tampered with or lost." *Id.*

The Wyoming Attorney General's office forwarded the LAW records request ("LAW request") to a law firm that represented CMS in several matters. On July 31, 2000, the law firm responded to the LAW request. And, on the last day of August 2000, it notified Medical Claims Management Group ("MCMG"), CMS's third party administrator, of a "possible claim" by Roan Eagle. Aplt. App. at A-517.

-3-

On October 31, 2000, NAS issued a claims-made insurance policy[1] for health care liability to CMS. The NAS policy offered coverage from October 1, 2000 until October 1, 2001, subject to CMS's $100,000.00 self-insured retention.

The policy defined a "claim" as follows:

> (1) an express demand for damages arising from a medical incident or a staff privileges incident to which this insurance applies; an express demand for damages shall be deemed to include a civil action in which damages to which this insurance applies are alleged and an arbitration proceeding to which the insured is required to submit by statute or court rule or to which the insured has submitted with Company's consent; or
>
> (2) an act or omission which the insured reasonably believes will result in an express demand for damages to which this insurance applies.

Aplt. App. at A-38.

The policy contained an array of general exclusions. Of particular

---

[1] We have previously discussed the nature of a claims-made policy:

"Occurrence-based" insurance requires the insurer to cover any liability that results from an event that occurred during the policy period—even if the injury is discovered and the claim is made after the expiration of the coverage period. This type of insurance contrasts with the second relevant type of insurance—"claims-made." Under this scheme, the date of the discovery of the injury and the claim-filing date must fall within the policy period. Generally, a claims-made policy includes a retroactive date that precludes coverage for liability-producing events occurring prior to that date.

*Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.,* 358 F.3d 736, 738 (10th Cir. 2004).

importance to this litigation is exclusion (h)(3), which barred coverage for any claim against an insured "arising from a demand, summons or *other notice* received by the insured prior to the effective date of the policy." Aplt. App. at A-37 (emphasis added).

On December 7, 2000, the MCMG litigation administrator completed a Loss Advisory Form—a PHICO-provided form used to report claims—which assigned a claim date of August 11, 2000 for the Roan Eagle matter. However, PHICO did not receive the form. On July 25, 2001, LAW sent a Notice of Claims to the Penitentiary and the Wyoming Department of Health, expressly demanding $15,000,000.00 "for the claims of the Estate of Orlando Roan Eagle for his wrongful death." Aplt. App. at A-332. Almost a year later, Roan Eagle filed a wrongful death action against CMS. When CMS had almost exhausted its self-insured retention, it notified NAS of the claim.

After investigating, NAS determined that the Roan Eagle claim was not covered by its policy, and orally denied coverage. CMS nevertheless continued to request coverage. On June 6, 2003, NAS and CMS agreed that each would pay half of the legal fees and expenses for the Roan Eagle claim, and that they would revisit the coverage issues. On July 15, 2003, NAS formally denied coverage based, as pertinent here, on exclusion (h)(3).

A day after it denied coverage, however, NAS attended a mediation in the Roan Eagle case and agreed to settle the matter. NAS ultimately paid the Roan

Eagle settlement.

### *B. Procedural History*

After paying the settlement, NAS filed a complaint against CMS seeking a declaratory judgment that (1) its policy does not provide coverage to CMS, (2) CMS must reimburse NAS for its settlement of the Roan Eagle suit, and (3) CMS may not recoup any defense expenses incurred in the Roan Eagle litigation. NAS alleged that its policy excluded coverage because CMS had knowledge of the Roan Eagle claim prior to the policy's effective date. Conversely, CMS denied that it received notice within the meaning of the policy prior to its effective date.

Both parties moved for summary judgment. On March 23, 2005, the district court granted in part and denied in part both motions. The district court noted that "other notice" was not a defined term and concluded that "giving the term its plain and ordinary meaning does not reveal the parties' intention." Aplt. App. at A-574. Therefore, it declared the language to be ambiguous.

Applying the ambiguity against the insurer, the district court determined that the LAW request was not "other notice" within the meaning of exclusion (h)(3). In reaching this result, the district court relied upon the contractual construction principle known as ejusdem generis,[2] which led the court to conclude

---

[2] This canon of construction provides "that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." BLACK'S LAW DICTIONARY 556 (8th ed. 2004); *see generally* 2 Lee R. Russ & Thomas F. Segalla, COUCH ON
(continued...)

that "'other notice' must be construed to be similar to the more specific terms of 'demand' or 'summons.'" Aplt. App. at A-575. According to the court, the LAW request was not sufficiently similar to these terms:

> The request for medical records did not contain a demand for money, did not mention malpractice, and did not mention the possibility of a future claim or lawsuit. At most, the request implied that there *could be* a claim in the future. A possibility of a claim, however, does not rise to the level of definitiveness required by the term "other notice" when that term is construed to be similar to a "demand" or "summons."

*Id*. at A-576. Therefore, the court concluded that NAS's policy did not exclude the Roan Eagle claim from coverage.[3]

---

[2](...continued)
INSURANCE 3D § 22:1, at 22-4 (2005) ("The rule[] of . . . ejusdem generis ha[s] been applied in insurance cases.").

[3]     Although its conclusion is thoroughly reasoned, the district court's explication lacks precision. Some of its language could suggest that it was deciding whether the LAW request was a "claim" within the meaning of the NAS policy. *See* Aplt. App. at A-574 ("[T]he question before the Court is whether a claim was made or asserted against CMS prior to October 1, 2000."). Significantly, in at least two instances, in determining the proper characterization of the LAW request, the district court treats the "claim" and "notice" issues as one unit, suggesting that the inquiry was whether the LAW request was "*a claim* arising from other notice." *Id*. at A-573, A-578 (emphasis added). In the same vein, the court relied in part on cases addressing whether a medical records request constituted a claim. *Id.* at A-575 (citing *Gaston Mem. Hosp., Inc. v. Va. Ins. Reciprocal*, 80 F. Supp. 2d 549, 554 (W.D.N.C. 1999)). However, when the district court's order is read as a whole, the dominant signal is that the court understood that, at the very least, the principal question before it was whether "LAW's request for medical records constitutes 'other notice'" as that term is used in exclusion (h)(3). *Id.* at A-574. And its partial reliance on claim-related case law might be explained by what NAS referred to as the "scarc[ity]" of "cases discussing or interpreting th[e] precise language at issue here." *Id.* at A-378.

(continued...)

-7-

Because the NAS policy covered the Roan Eagle claim, the district court also held that NAS was not entitled to reimbursement of the settlement proceeds. Correspondingly, because NAS was obligated by its policy to pay reasonable defense expenses, CMS was entitled to reimbursement of the attorney's fees and costs it incurred in defending the Roan Eagle action. Although the March 23, 2005 order established NAS's liability for damages, it did not award them. NAS timely appealed that order in appeal no. 05-8038.

Several months after NAS filed appeal no. 05-8038, the parties stipulated to

---

[3](...continued)

Importantly, NAS's complaint and its motion for summary judgment underscore that the issue before the district court was when CMS had knowledge (i.e., notice) of the Roan Eagle claim, not whether the factual circumstances giving rise to the alleged knowledge themselves comprised a "claim" under the policy. *See* Aplt. App. at A-12 (noting that "[c]overage is not available under the Policy" because CMS "had knowledge of the claim prior to the effective date of the NAS policy") (Complaint for Declaratory Relief, dated June 17, 2003); *id.* at A-378 ("The question then obviously in this case is . . . whether the facts outlined above sufficiently constitute 'other notice' of a claim or potential claim or likelihood that it was going to occur.") (Mem. in Supp. of Mot. for Summ. J. of Pl., dated Feb. 8, 2005). *Cf. id.* at A-346 (NAS's written denial of coverage to CMS, citing exclusion (h), and most relevant here (h)(3)). Furthermore, CMS understood that a notice issue (not a claims issue) was before the district court. *See id.* at A-531 ("NAS' case now rests on the application of one policy exclusion, Exclusion (h)(3), which bars a claim that arises from 'a demand, summons or other notice' received prior to the effective date of the policy (*i.e.*, prior to October 1, 2000).") (Defs.' Br. in Opp'n to Pl. Mot. for Summ. J., dated Feb. 22, 2005). Therefore, we do not view it as appropriate to decide here—and the parties do not call for us to do so—whether the LAW request constituted a "claim" as defined by the policy: more specifically, "an act or omission which the insured reasonably believes will result in an express demand for damages to which this insurance applies." *Id.* at A-38.

the amount of damages and, on July 14, 2005, the district court entered a judgment. On August 23, 2005, NAS filed a motion for leave to file a supplemental notice of appeal pursuant to FED. R. APP. P. 4(a)(5), which the court granted the following day. NAS filed a supplemental notice of appeal on August 24, 2005. And, on September 7, 2005, NAS filed appeal no. 05-8082.

CMS filed a motion to vacate the district court's August 24, 2005 order, citing the district court's failure to provide notice and an opportunity to respond to NAS's motion. The district court agreed, and, on January 18, 2006, vacated its August 24, 2005 order. After allowing both parties the opportunity to respond, the district court, on February 14, 2006, granted NAS's motion for leave to file a supplemental notice of appeal. The district court purported to make the effective date of the order the date it initially had authorized the filing of a supplemental notice of appeal—that is, August 24, 2005—"[i]n order to avoid unnecessary filings and needless expense." Aplt. App. at A-623. NAS did not file a new notice of appeal.

## II.

### A. *Appellate Jurisdiction*

#### 1. Appeal No. 05-8038

CMS moved to dismiss appeal no. 05-8038 claiming that the district court's March 23, 2005 order was not final and appealable because, although it found NAS liable for CMS's defense costs and attorney's fees, it did not award

-9-

damages. On the other hand, NAS claims that since the issue of attorney's fees is generally collateral to the merits of the case, the March 23, 2005 order is final despite the lack of a determination regarding attorney's fees. We conclude that the March 23, 2005 order is not final.

Under 28 U.S.C. § 1291, this court only possesses appellate jurisdiction over "final decisions" of district courts. *See Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 969 (10th Cir. 2006). This requirement "precludes consideration of decisions . . . that are but steps towards final judgment in which they will merge." *Id*. (internal quotation marks and brackets omitted). In *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196 (1988), the Court noted that because a request for attorney's fees under 42 U.S.C. § 1988 is collateral to the merits, a decision on the merits of the case is final even absent a finding regarding the recoverability or the amount of attorney's fees. *Id*. at 202-03. However, as we recognized in *Lampkin v. UAW*, 154 F.3d 1136 (10th Cir.1998), the *Budinich* holding does not apply in cases where attorney's fees are "inseparable from the 'merits' of plaintiff's claim." *Id*. at 1141. The Federal Rules of Civil Procedure embody this distinction. *See* FED. R. CIV. P. 54(d)(2)(A) (claims for attorney's fees should be made by post-judgment motion unless "substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial"); FED. R. CIV. P. 58(c) (entry of judgment "may not be delayed" to tax costs or award fees, except when litigant makes timely motion under Rule 54(d)(2)).

In this case, the costs and attorney's fees CMS expended in defending the Roan Eagle litigation represent compensatory damages for NAS's breach of its insurance contract. The amount of defense costs and attorney's fees awardable is therefore inseparable from the merits of CMS's breach of contract claim. Because the district court's March 23, 2005 order is not final pursuant to 28 U.S.C. § 1291, we dismiss appeal no. 05-8038.

### 2. Appeal No. 05-8082

CMS also moved to dismiss appeal no. 05-8082 for lack of appellate jurisdiction. CMS argues that because NAS was not authorized to file a supplemental notice of appeal until the district court entered the February 14, 2006 order, its failure to file a second supplemental notice of appeal within ten days of that order dooms its appeal under FED. R. APP. P. 4(a)(5)(C). We disagree.

"[T]he timely filing of a notice of appeal in a civil case is a jurisdictional requirement." *Bowles v. Russell*, 127 S. Ct. 2360, 2366 (2007); *see Budinich*, 486 U.S. at 203 (noting that "the taking of an appeal within the prescribed time is mandatory and jurisdictional"). FED. R. APP. P. 4(a)(1)(A) provides that notice of appeal in a civil case must be filed with the district court "within 30 days after the judgment or order appealed from is entered." The district court may extend the time upon a showing of "excusable neglect or good cause," if a party moves for an extension no later than thirty days after the time to appeal has expired. FED.

R. App. P. 4(a)(5)(A); *see also Bishop v. Corsentino*, 371 F.3d 1203, 1206 (10th Cir. 2004). Fed. R. App. P. 4(a)(5)(B) requires the district court to give notice to non-moving parties when a motion for extension is filed after the expiration of the thirty-day period to file a notice of appeal. Here, although the district court erred in granting NAS's motion for extension of time ex parte, it later remedied the error by vacating the August 24, 2005 order, and by entering its February 14, 2006 order granting the extension of time.

At issue is whether the February 14, 2006 order validated NAS's previously-filed supplemental notice of appeal. Our decision in *Hinton v. City of Elwood,* 997 F.2d 774 (10th Cir. 1993), dictates that it did.

In *Hinton*, the plaintiff filed his notice of appeal one day late and subsequently moved, within the time period prescribed by Fed. R. App. P. 4(a)(5), to extend the time to file a notice of appeal. *Id.* at 777. The district court granted the motion, but the plaintiff did not file a second notice of appeal. *Id.* at 777-78. We held that so long as the order appealed from "remain[s] unchanged in both its form and its content," a premature notice of appeal retains its validity. *Id.* at 778. We further observed:

> A motion to extend, unlike a motion for a new trial for example, does not portend any substantive alteration in the form or content of the order being appealed from. Consequently, as in the case of a notice of appeal from an interlocutory order disposing of less than all the claims, to require the filing of a new notice of appeal following a motion to extend would amount to little more than "empty paper

shuffling." We do not believe the Federal Rules of Appellate
Procedure were designed to impose such a hollow ritual on a
would-be appellant.

*Id.* at 778 (quoting *Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 644 (10th Cir.
1988)).

Applying *Hinton*, we conclude that the district court's February 14, 2006

grant of NAS's motion to extend validated its previously-filed supplemental

notice of appeal since the district court's July 14, 2005 judgment remained

unchanged in both its form and content throughout the period at issue.[4]

Therefore, we deny CMS's motion to dismiss appeal no. 05-8082, and reach the

merits.

### B.  Standard of Review

We review a grant of summary judgment de novo.  *See Simms v. Okla. ex*

*rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th

---

[4]     Citing *Bowles*, 127 S. Ct. at 2363 (holding that court of appeals
"lacked jurisdiction to entertain an appeal filed outside the 14-day window
allowed by § 2107(c) but within the longer period granted by the District Court"),
CMS vigorously argues that the district court, in its February 14, 2006 order, was
without power to revive nunc pro tunc its August 24, 2005 order granting NAS's
motion to file its supplemental notice of appeal.  The district court may well have
been acting under the view that to validate the earlier-filed supplemental notice of
appeal it had to revive its August 24 Order nunc pro tunc, because the court
suggested that otherwise there would be further appeal-related filings.  *See* Aplt.
App. at A-623 (making order effective August 24 "[i]n order to avoid unnecessary
filings and needless expense").  Because we conclude that the district court's
February 14 order was itself sufficient—even if operative only as of that date—to
validate NAS's supplemental notice of appeal, we need not reach the question of
the district court's power to revive nunc pro tunc the August 24 order.

Cir. 1999).  As this court has often explained:

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Id.*  But the nonmoving party must offer more than "a scintilla of evidence" in support of his position: "an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."  *Id.* (internal quotation marks omitted).

### *C.  Analysis*

In this diversity case, we apply Missouri law.[5]  When interpreting an insurance policy, we read all policy provisions together and apply the plain meaning of the policy terms.  *See Hawkeye-Sec. Ins. Co. v. Davis,* 6 S.W.3d 419, 424 (Mo. Ct. App. 1999).  If the parties' intent can be discerned from the plain language of the policy, we will not use construction tools to interpret the contract.  *See Stotts v. Progressive Classic Ins. Co.*, 118 S.W.3d 655, 662 (Mo. Ct. App. 2003).

---

[5]     The district court found that Missouri law governed the interpretation of the NAS policy, a finding the parties do not dispute on appeal.  Therefore, we analyze the policy under Missouri law.  *See, e.g., Flying J Inc. v. Comdata Network, Inc.,* 405 F.3d 821, 832 n.4 (10th Cir. 2005) (appellate courts do not normally address choice of law issues sua sponte where parties acquiesce in application of a certain state's law).

Policy "[l]anguage is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layperson who bought and paid for the policy." *Lincoln County Ambulance Dist. v. Pac. Employers Ins. Co.*, 15 S.W.3d 739, 743 (Mo. Ct. App. 1998). No presumption of ambiguity arises from the lack of a definition in a policy. *See Am. Family Mut. Ins. Co. v. Peck*, 169 S.W.3d 563, 567 (Mo. Ct. App. 2005). Nonetheless, if undefined terms are ambiguous, "rules of construction will apply and ambiguous provisions will be construed against the insurer." *Lincoln County Ambulance Dist.*, 15 S.W.3d at 743; *see Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210 (Mo. 1992). In particular, doubts will be resolved in favor of the insured. *See Am. Family Mut. Ins. Co.*, 169 S.W.3d at 568. To ascertain the ordinary meaning of a word, Missouri courts often refer to the standard dictionary definition. *See Watters v. Travel Guard Int'l*, 136 S.W.3d 100, 108 (Mo. Ct. App. 2004). With these principles in mind, we now turn to the NAS policy.

The NAS policy excludes any claim against an insured "arising from a demand, summons or *other notice received by the insured* prior to the effective date of this policy. . . ." Aplt. App. at A-37 (emphasis added). We conclude that the undefined phrase "other notice" in exclusion (h)(3) is ambiguous in that it is susceptible to more than one reasonable interpretation. Resolving doubts in favor of the insured, we perceive CMS's interpretive position to be more apt.

-15-

Accordingly, like the district court, we determine that NAS's policy provides coverage to CMS for the Roan Eagle claim.

The phrase "other notice" is ambiguous. As NAS pointed out, the word "notice" can mean "attention," "observation," or a "notification or warning of something, *esp. to allow preparations to be made*." Aplt. Op. Br. at 32 (emphasis added and internal quotation marks omitted) (quoting THE NEW OXFORD AMERICAN DICTIONARY 1171 (1st ed. 2001)). Based on this definition, NAS argues that CMS had "other notice" of the claim arising from the Roan Eagle suicide before the October 1, 2000 policy inception date.

NAS views the LAW request as the primary source of this "other notice"—in the sense that the LAW request allegedly drew CMS's attention to the potential Roan Eagle claim and provided CMS with warning adequate for CMS to take necessary preparatory steps to defend against it. We cannot say on these facts that this interpretation of the term "other notice" is unreasonable.

However, NAS's "other notice" argument is not limited to the LAW request. NAS highlights actions taken by CMS and its agents both before and after the October 2000 policy inception date that it contends demonstrate that CMS had "other notice"of the Roan Eagle claim before that date. These actions include the August 2000 communication by CMS's defense counsel to MCMG characterizing the Roan Eagle suicide as a "possible claim," Aplt. App. at A-517, and MCMG's December 2000 assignment of a claim date of August 2000 to the

-16-

Roan Eagle matter.  Thus, NAS argues that the "July 2000 medical records request received by CMS and CMS's conduct thereafter demonstrate that it possessed the requisite 'other notice' that triggers Exclusion (h)(3)'s application." Aplt. Op. Br. at 34.

In arguing that it did not have "other notice," CMS also relies on conventional dictionary definitions of "notice."  It asserts that the term "notice" covers "a communication of intelligence or of a claim or demand often required by statute or contract and prescribing the manner or form of giving it."  Aplee. Br. at 25 (internal quotation marks omitted) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1544 (1993)).  Centering itself on this definition, CMS maintains that "the language, properly construed, merely requires that the 'other notice' must emanate from a claimant and must have sufficient formality and particularity as to signal the sender's intent to make a claim."[6]  *Id.* at 34.  As

_____

[6]        CMS also advanced a more aggressive position arguing that "in the legal context," notice is present "only when given as required by a statute or contract, if applicable."  Aplee. Br. at 25.  Building on this premise, it reasoned that, because the Roan Eagle matter involved a tort claim against a governmental entity, "other notice" corresponded with the notice required by the Wyoming Governmental Claims Act, WYO. STAT. ANN. § 1-39-113.  *Id*. at 25-26.  Because the Notice of Claims submitted by Roan Eagle *after* the NAS policy inception date was the only communication to CMS that fully complied with Wyoming's statute, CMS argued that it had notice within the meaning of the policy only when it received the Notice of Claims.  *Id.*  However, as is evident by our discussion, this position plays no significant role in marking the battle lines between the parties.  The district court did not endorse this position, and we need not do so to resolve this case.  CMS effectively reads the "other notice" language as requiring—at a minimum—that the communication received by the insured from

(continued...)

-17-

with NAS's interpretation, we discern nothing unreasonable about CMS's reading of "other notice."

Resolving doubts in favor of CMS as we must, however, we conclude that its interpretation prevails. We are fortified in this conclusion by our consideration of CMS's assertions regarding the proper analytic focus. CMS argues that under the plain language of the contract we must focus on the notice *received* by the insured from a claimant (or someone acting on the claimant's behalf), not actions or knowledge possessed by the insured. *See* Aplee. Br. at 39 ("Coverage depends on *notice received* from the claimant, not *knowledge* obtained by the insured from experience, intuition, or osmosis."). CMS reasons, therefore, that the inquiry centers on whether CMS *received* some communication before the October 2000 commencement of the policy period that constitutes "other notice"—more specifically, whether the LAW request constitutes such notice. Under CMS's view, NAS's evidence of the actions CMS and its agents took after receiving the LAW request are irrelevant. The district court essentially adopted CMS's view on this point finding that the "other notice" language "refers to actions of claimants, not the insured." Aplt. App. at A-577. We agree.

_____

[6](...continued)
the claimant bears indicia of a formal and particularized claim for relief. As noted *infra*, we conclude that CMS's interpretation of this ambiguous language is controlling. And the LAW request does *not* meet this minimum standard. Accordingly, even under a less aggressive reading of "other notice," (h)(3) does not exclude the Roan Eagle claim from coverage.

-18-

Accordingly, we confine our discussion to the notice implications of the LAW request. Like the district court, we find the principle of ejusdem generis helpful in determining whether the LAW request qualifies as "other notice" within the meaning of exclusion (h)(3).[7] In legal parlance, the words "demand" and "summons" commonly connote or relate to a formal assertion of a right to legal relief. *See* BLACK'S LAW DICTIONARY 462, 1477 (8th ed. 2004). Applying the rule of ejusdem generis, therefore, "other" kinds of notice must resemble a formal assertion of a right to relief. The LAW request does not satisfy this standard because it sought medical records, not a right to relief. In fact, it never mentioned even the *possibility* that Roan Eagle would either formally demand money or institute a lawsuit. As the district court noted, at best it "implied that there *could be* a claim in the future." Aplt. App. at A-576. Consequently, resolving the contractual ambiguity in CMS's favor, we conclude that (h)(3) does not exclude the Roan Eagle claim from coverage.

NAS's citation to *North American Specialty Insurance Co. v. Correctional Medical Services, Inc.*, No. 4:04CV798 CDP, 2006 WL 208635 (E.D. Mo. Jan. 26, 2006), a case applying Missouri law and finding that (h)(3) excluded coverage for an inmate's medical malpractice claim, does not alter our conclusion. A somewhat detailed discussion of the facts of *Correctional Medical Services* is

---

[7] Notably, Missouri courts have applied the doctrine in the insurance context. *See Transit Cas. Co. in Receivership v. Certain Underwriters at Lloyd's of London*, 963 S.W.2d 392, 398 (Mo. Ct. App. 1998).

-19-

necessary to place our views in the proper context.

There, an inmate sued the State of Arizona and Correctional Services Corporation ("CSC"), the state-contracted administrator of the prison facility where the alleged malpractice occurred. *Id.* at *1. CSC, in turn, had hired CMS to provide health care to inmates at the facility. *Id.* As in this case, at the time of the alleged malpractice, PHICO insured CMS, and Northland Insurance Company ("Northland") insured CSC. *Id.* In April and September 2000, CSC formally requested that CMS defend and indemnify CSC in the medical malpractice action, stressing that CMS employed or contracted with the individuals who allegedly provided the negligent medical care to the inmate. *Id.* CMS refused the demands. *Id.*

One year after CMS's October 2000 purchase of professional liability insurance policies from NAS—each of which contained exclusion (h)(3)—the Arizona Supreme Court entered judgment on the medical malpractice action against the State of Arizona.[8] *Id.* at *1-2. Northland satisfied this judgment, and subsequently sought indemnification and contribution from CMS. *Id.* at *2. In response, CMS requested that NAS defend and/or indemnify CMS in the Northland suit. *Id.* at *3. Relying in part on exclusion (h)(3), NAS denied CMS's claim, arguing that, prior to October 2000, the tenders of defense alerted

---

[8]    Pursuant to a settlement agreement, CSC was dismissed as a defendant prior to trial. *Id.* at *2 n.1.

-20-

CMS that an express demand for damages would arise. *Id.* at * 6. NAS then sought a declaratory judgment that it had no duty to defend or indemnify CMS in the Northland suit. *Id.* at *1.

The court construed CMS as arguing that "any act short of an 'express demand for damages,' or the filing of a lawsuit, fails to qualify as a 'demand, summons or other notice.'" *Id.* at *6. Based on its review of the insurance contract, the court rejected that contention, concluding "that the parties did not intend 'demand, summons or other notice' to have such a limited meaning." *Id.*

The district court implicitly found exclusion (h)(3) to be unambiguous. Relying on dictionary definitions, the court construed the term "demand" to mean "to claim legally or formally." *Id.* at *7 (internal quotation marks omitted). The tenders of defense met this definition because they formally asserted CSC's contractual rights to a defense and indemnification in the underlying malpractice suit. *Id.* Rejecting the applicability of ejusdem generis, the court appeared to construe the term "other notice" as meaning a notice that is somewhat less formal than a "demand," stating: "[S]hould there be any doubt whether these tenders of defense constitute 'demands,' I agree with North American that they clearly fall within the plain meaning of 'other notice.'" *Id.* Significantly however, the court rested its "other notice" determination on a finding that, by virtue of "the tenders of defense and notices that CMS received prior to October 1, 2000," CMS was "informed, in no uncertain terms, of CSC's intent to hold CMS responsible for the

-21-

fact that the negligence of its own employees or independent contractors was directly responsible for" the inmate's injury. *Id.* The court therefore found that (h)(3) excluded coverage.

Although the district court in *Correctional Medical Services* apparently did not perceive the same ambiguity in exclusion (h)(3) that we do, its reading of the contract and ultimate conclusion are otherwise consistent with the result that we reach here. Accordingly, *Correctional Medical Services* does not give us pause.

In *Correctional Medical Services*, CMS framed the issue as whether only an express demand for damages or the filing of a lawsuit constituted "other notice" within the meaning of exclusion (h)(3). In answering this question, the court stressed that the language was not "limited to the filing of a lawsuit." *Id.* CMS's principal contentions here, in contrast, do not present the same issue for our consideration. CMS accepts that the "other notice" in exclusion (h)(3) encompasses something less than an express demand for damages or the filing of a lawsuit, noting that "the language, properly construed, merely requires that the 'other notice' must emanate from a claimant and must have sufficient formality and particularity as to signal the sender's intent to make a claim." Aplee. Br. at 34.

CMS's reading of the contract seems to be in fact fully consistent with the district court's reading of the same language in *Correctional Medical Services* First, as CMS argues here, the district court in *Correctional Medical Services*

-22-

focused on what communications CMS *received* from the claimant, not the knowledge that the insured possessed. *See* 2006 WL 208635*,* at *7 (looking at "the tenders that CMS received" prior to the policy commencement date). Second, although apparently viewing the "other notice" language as allowing for something less than a "demand," the district court still seemed to construe it (as does CMS here) as requiring a communication of sufficient formality and definiteness to signal a claim for relief. In that regard, the court noted that CSC's tenders informed CMS, "in no uncertain terms," that it intended to hold CMS responsible for any damages arising from CMS's employees' negligence. *Id.*

Under this view of the "other notice" language—a view shared by the district court in *Correctional Medical Services* and CMS here—it is not surprising that the coverage outcome for CMS in *Correctional Medical Services* and this case differ. The tenders of defense in *Correctional Medical Services* specifically requested that CMS perform its contractual duty to defend and indemnify CSC in an already-filed lawsuit. By contrast, the LAW request in this case did not specifically convey to CMS that a medical malpractice action would—or even might—be filed in the future.

In sum, we have concluded that the "other notice" language of exclusion (h)(3) is ambiguous and that CMS's reading of it is reasonable. Resolving doubts in favor of CMS, the insured, its reading must prevail. Accordingly, we conclude that CMS is entitled to coverage under the NAS policy. In particular, NAS was

obligated by its policy to pay CMS's reasonable defense costs and attorney's fees. And, because NAS had an obligation to cover the Roan Eagle claim, NAS is not entitled to recoup the settlement proceeds it paid on CMS's behalf.

For the reasons noted, NAS's appeal no. 05-8038 is **DISMISSED**.  With regard to appeal no. 05-8082, we **AFFIRM** the district court's judgment in favor of CMS.